**UNITED STATES DISTRICT COURT**         **EASTERN DISTRICT OF TEXAS**

IN RE: CAROL ALISON RAMSEY ROSE     §     CIVIL ACTION NO. 4:19-CV-98

| | | |
|---|---|---|
| CAROL ROSE and CAROL ROSE, INC., | § | |
| | § | |
| Appellants, | § | |
| | § | |
| *versus* | § | APPEAL OF ADVERSARY NO. |
| | § | 17-04104 |
| LORI AARON, PHILLIP AARON, AARON | § | |
| RANCH, and JAY MCLAUGHLIN, | § | |
| | § | |
| Appellees. | § | |

| | | |
|---|---|---|
| CAROL ALISON RAMSAY ROSE and | § | |
| CAROL ROSE, INC., | § | |
| | § | |
| Appellants/Cross-Appellees, | § | |
| | § | |
| *versus* | § | APPEAL OF ADVERSARY NO. |
| | § | 17-04131 |
| EQUIS EQUINE, LLC, and ELIZABETH | § | |
| WESTON, | § | |
| | § | |
| Appellees/Cross-Appellants. | § | |

## OPINION

"No hour of life is wasted that is spent in the saddle."[1]  Perhaps if the parties in this case had spent more time riding their horses than fighting over them, they would have wasted less hours of their lives.  Nevertheless, after nearly a decade of squabbling both in and out of court, the parties continue their crusades before this court after extensive litigation in the court below.  On September 27, 2019, the bankruptcy court entered its Amended Order and Amended

---

[1] Attributed to Winston Churchill, former Prime Minister of the United Kingdom.

Memorandum Opinion, from which this appeal is taken.  Having reviewed the bankruptcy court's

opinion and order, the record, the submissions of the parties, and the applicable law, the court is

of the opinion that the bankruptcy court's decision should be affirmed in part and reversed in part.

I.      Background

        A.      Factual History

        Carol Rose ("Rose"), a well-known quarter horse breeder, has been in the equine industry

for over fifty years, specializing in the breeding, training, and showing of performance quarter

horses.  Rose is the president and sole owner of Carol Rose, Inc., which owns a large ranch in

Gainesville, Texas ("Gainesville Ranch"), where Rose based her operations.  Amidst the economic

crises of 2007-2008, Rose experienced cash flow and other financial problems.  After years of

financial hardship, by early April 2013, Rose had decided to exit the horse business, at which

time, she began contacting prospective buyers of her business and ranch.  Rose also advertised an

upcoming auction of her stallions, broodmares, and prospects, as well as her tack and equipment,

at a "complete dispersal sale" to be held at the Gainesville Ranch on August 15-17, 2013

("Dispersal Sale").

                1.      Rose's Agreement with the Aarons

        Eventually, Rose found a potential buyer of her quarter horse business.  Lori ("Lori") and

Phillip Aaron ("Phillip") (collectively, the "Aarons") owned a ranch in Commerce, Texas

("Commerce Ranch") where they bred and raised non-performance horses.[2]  After negotiations,

Rose agreed to sell the Aarons a number of horses, lease the Gainesville Ranch to them for a

---

[2] The Aarons owned Aaron Ranch, a partnership between the Aarons, as well as Broken Arrow
Cattle Company, LLP ("Broken Arrow"), which the Aarons utilized in their ranching operations.

2

five-year period, and provide her services as a consultant for five years. The new business would operate under the "Aaron Ranch" name. Rose and Carol Rose, Inc. (collectively, the "Rose Parties"), and the Aarons and Aaron Ranch (collectively, the "Aaron Parties") executed a Confidential Term Sheet, Consulting Agreement, and Lease with Purchase Option ("Lease") memorializing their agreement. Under the Lease, the Aaron Parties were to pay the Rose Parties $2.5 million in monthly increments over the five-year term.

The Confidential Term Sheet, executed on August 6, 2013, ten days before the Dispersal Sale, included two lists of horses, the Blue List and the Red List. The Blue List contained 39 horses for which the Aarons agreed to pay $3,315,000.00. Additionally, the Aarons were required to bid on the Blue List Horses at the Dispersal Sale. Specifically, the Confidential Term Sheet provided:

> [The] Aaron[s] shall purchase the horses identified in [the Blue List] for the prices specified thereon. Rose and [the] Aaron[s] understand that these horses will pass through the Dispersal Sale Auction scheduled for August 16, 2013. The applicable American Quarter Horse Association ("AQHA") registration certificate and transfer report will be provided to [the] Aaron[s] at the price identified on [the Blue List], if [the] Aaron[s] [are] the last bidder.

Essentially, Rose required the Aarons to bid on the horses that they had "purchased" at the Dispersal Sale. If they were the highest bidders, they paid the originally agreed price for the horse, not the hammer price; if they were not the highest bidders, they received the proceeds for the horse, including the difference between the negotiated price and the hammer price. The Red List contained 15 additional horses that Rose recommended the Aarons purchase at the Dispersal Sale. At Rose's request, the Aarons kept the terms sheet that identified the Blue List Horses and their purchase price confidential. Rose's attorney, Lewis Stevens ("Stevens"), assured the Aarons that their agreement with Rose "was legal, ethical, and common in the horse industry."

3

2.    The Dispersal Sale

Before her deal with the Aarons was finalized, Rose began to advertise and plan the Dispersal Sale, including the creation of a Dispersal Sale catalog ("Sale Catalog"). The Sale Catalog included advertisements for the 144 horses that were to be sold during the Dispersal Sale. Rose characterized the Dispersal Sale as a "complete dispersal sale" in many of the advertisements, as well as the Sale Catalog, which was published online. Elizabeth Weston ("Weston") noticed the advertisements for the Dispersal Sale online and decided to attend the auction.[3] She sent the Sale Catalog to Victor Froeschl ("Froeschl") who was described as "professional and knowledgeable" with respect to quarter horses. Froeschl attended the Dispersal Sale with Weston. The Sale Catalog included as a condition of sale: "The right to bid is reserved for all consignors unless otherwise announced." Prior to the Dispersal Sale, Weston signed the Registration Agreement, which incorporated the condition of sale referenced above.

On the morning of the Dispersal Sale, Rose met with the auctioneers and provided them three-ring binders that she had prepared for them. The binders contained copies of the pages of the Sale Catalog that described each horse. On the pages that corresponded to the Blue List Horses, Rose placed the letter "A" and wrote the price that the Aarons had paid for each of the horses. Rose explained to the auctioneers that she had a deal with the Aarons to sell them the horses marked with "A" for the agreed prices. Despite the Aarons' prior purchase of the horses for approximately $3.3 million, Rose did not withdraw the Blue List Horses from the Sale Catalog

---

[3] At the time, Weston was looking for horses that her son could use in mounted archery competitions.

or reveal that they had already been sold, thus making it appear to the Dispersal Sale attendees that the Aarons purchased the thirty-nine horses at the sale.

The Aarons arrived just before the Dispersal Sale started.  When they arrived, Rose's lawyer, Stevens, handed them a prepared three-ring binder that included instructions for bidding on the Blue and Red Lists Horses.  The Aarons, along with Stevens, sat on the front row at the Dispersal Sale.  Due to the agreement regarding the Blue List Horses, the Aarons appeared to the rest of the attendees at the Dispersal Sale to be competing vigorously for the horses that they hoped to purchase and submitting bids that would ultimately set the purchase price.  Thus, the arrangement gave the auction a false appearance of competitive bidding.  Even though the Aarons submitted higher bids on some of the Blue List Horses that they won, they paid only the pre-arranged prices set forth in the Confidential Term Sheet.

The Aarons were the highest bidders on every Blue List Horse except for SHINERS LENA DOC.  SHINERS LENA DOC was the full-blood brother of A SHINER NAMED SIOUX, another Blue List Horse that the Aarons won with a hammer price of $850,000.00.  During the auction, the auctioneers reminded the crowd of the relationship between the horses as well as A SHINER NAMED SIOUX's sales price.  Given the relationship, Weston bid on SHINERS LENA DOC and, eventually, was the highest bidder at $190,000.00.[4]  In addition to SHINERS LENA DOC, Weston purchased four other horses at the Dispersal Sale.

After the Dispersal Sale, Rose and Weston agreed to keep Weston's horses at the Gainesville Ranch.  Rose sent monthly invoices to Weston for the boarding and care of the horses. Shortly after the Dispersal Sale, Weston formed Equis Equine, LLC ("Equis Equine"), to pay the

---

[4] As a Blue List Horse, the Aarons agreed to purchase SHINERS LENA DOC for $150,000.00.

boarding fees and other charges billed to Weston by Rose.  In February 2016, Equis Equine sold all of the horses Weston had purchased at the Dispersal Sale, aside from SHINERS LENA DOC, at a public auction in San Antonio, Texas.

3.      Rose's Relationship With the Aarons Turns Hostile

After the Dispersal Sale, Rose's relationship with the Aarons began to deteriorate.  The court will not recount much of Rose's misbehavior, as discussed in detail by the bankruptcy court, because the particulars are not germane to this appeal.[5]  Important here, Rose permanently locked the Aarons out of the Gainesville Ranch after hiring armed security.  Because they no longer had access to the Gainesville Ranch, the Aarons had to find another place to board, train, and breed the quarter horses they had purchased from Rose.  The Aarons ultimately decided to improve their Commerce Ranch to accommodate their quarter horse business.  Accordingly, they replaced five miles of fencing and constructed new stalls, run-in sheds and paddocks, a breeding facility and laboratory, and two lighted paddock areas.[6]

At the time Rose locked the Aarons out of the Gainesville Ranch, she had possession of most of the horses and equipment that the Aarons had purchased from her.  Rose asserted a

---

[5] Rose's misconduct includes secretly boarding horses at the Aarons' expense, disregarding the Aarons' hiring decisions, secretly giving raises to employees without the Aarons' permission, using the Aarons' property to promote her own business, using Aaron Ranch funds for her own personal use, interfering with the business activities of Aaron Ranch, and, most troubling, poisoning several horses, which possibly led to the death of one horse and the disability of another.

[6] At trial, Lori, testified that she had "personal knowledge of the bills paid regarding these improvements," but she was not able to confirm the exact amount the Aaron Parties spent on the necessary improvements.  She testified, however, that the Aaron Parties had spent at least $1,109,000.00 on the improvements.

"stableman's lien[7]" and demanded that the Aarons pay her $101,948.50 in order to regain possession of their horses and equipment.  Rose directed Stevens to send a demand letter with an attached spreadsheet detailing her claimed unpaid charges, such as the cost of utilities for the entire Gainesville Ranch, feed for all the horses in the Gainesville Ranch's care, as well as other expenses.  The stableman's lien included valid charges for the horses' care, as well as charges unrelated to the horses' care.  The Aarons paid the challenged amount and received possession of their horses.

4.      The Relationship Between Rose and Trainer Sours

Jay McLaughlin ("McLaughlin"), Rose's former head horse trainer whom she recommended that the Aarons retain, had an agreement with Rose for her to breed two horses from A SHINER NAMED SIOUX.  As part of the agreement, Rose agreed to sign the breeder certificates necessary to register the "product of the breeding" with AQHA.  A SHINER NAMED SIOUX sired two fillies, but Rose refused to deliver the breeding certificates.

B.      Procedural History

Rose filed three separate lawsuits against the Aaron Parties—two in Texas and one in Nevada.  One of those lawsuits was an action filed in the 235th Judicial District Court of Cooke County, Texas, on October 3, 2013 ("Rose-Aaron State Court Lawsuit").  In that lawsuit, Rose alleged that the Aarons breached the parties' contract, as well as fraudulently induced her to enter into both an agreement with respect to certain horses and the Lease of the Gainesville Ranch.  In

---

[7] Under the Texas Property Code, a "stable keeper with whom an animal is left for care has a lien on the animal for the amount of the charges for the care."  TEX. PROP. CODE § 70.003.  It appears that at least part of Rose's "stableman's lien" was actually and properly attributable to expenses for the boarding and caring of the Aarons' horses.

response, the Aaron Parties asserted counterclaims for breach of contract, breach of fiduciary duty, violation of the Texas Theft Liability Act ("TTLA"), fraud/negligent misrepresentation, civil conspiracy, tortious interference, and equitable subrogration.

Weston and Equis Equine (collectively, the "Weston Parties") filed their underlying lawsuit in the 235th Judicial District Court of Cooke County, Texas ("Weston State Court Lawsuit").  In their lawsuit, the Weston Parties asserted claims against the Aarons and the Rose Parties for common law fraud, fraudulent inducement, fraud by non-disclosure, negligent misrepresentation, violations of the TTLA, conspiracy, and aiding and abetting.  Additionally, the Weston Parties asserted claims against the Rose Parties, separately, for violations of Texas Business and Commerce Code § 2.328 and negligence.  The Weston Parties sought rescission of the sale of SHINERS LENA DOC as well as actual damages, exemplary damages, and attorney's fees.

In September 2017, the Rose Parties filed for bankruptcy and removed the Rose-Aaron State Court Lawsuit and the Weston State Court Lawsuit to the bankruptcy court, commencing Adversary Proceeding Nos. 17-04104 and 17-04125, respectively.  On December 19, 2017, the Weston Parties filed a complaint to determine dischargeability of the indebtedness owed by the Rose Parties and for equitable subordination of the Aaron Parties' claims, commencing Adversary Proceeding No. 17-4131.  According to the bankruptcy court,

> The Weston Parties' claims in the Weston State Court Lawsuit against the Rose Parties are subsumed in Adversary Proceeding 17-4131, and this Court enters judgment on those claims as provided herein.  The Weston Parties' claims against the other defendants in Adversary Proceeding 17-4125 were not adjudicated at trial and shall be adjudicated in subsequent proceedings.

The Weston Parties and the Aaron Parties filed proofs of claim in the Rose bankruptcy cases based on their respective claims in the state court litigation.  McLaughlin filed three proofs of claim

against Rose, one of which was for her failure to deliver the breeding certificates for the two fillies.

The bankruptcy court conducted a nine-day trial during May and June 2018.  On January 23, 2019, the bankruptcy court issued a Memorandum Opinion containing its findings of fact and conclusions of law.  The bankruptcy court rejected all of the Rose Parties' claims asserted against the Aaron Parties.  The bankruptcy court entered judgment in favor of the Aaron Parties on their claims for breach of contract, TTLA violations stemming from the improper stableman's lien, and breach of fiduciary duty; the remainder of the Aaron Parties' claims were rejected.  It awarded contract damages in the amount of $1,109,000.00 and TTLA damages in the amount of $61,257.32.[8]  The bankruptcy court also concluded that McLaughlin established an unsecured claim against Rose in the amount of $51,200.00.  Further, the bankruptcy court awarded the Aaron Parties attorney's fees to be determined at a separate time.[9]

With respect to the Weston Parties' claims, the bankruptcy court found in favor of them on all of their claims aside from their conspiracy, aiding and abetting, and equitable subordination claims.  The bankruptcy court granted rescission of the sale of SHINERS LENA DOC and awarded the Weston Parties damages in the amount of $437,918.12, prejudgment interest, post-judgment interest, and attorney's fees.

---

[8] The bankruptcy court concluded that "the Aarons . . . established a claim for breach of fiduciary duty but that they were not damaged with respect to this claim."

[9] The bankruptcy court entered a Memorandum Opinion and Order on October 14, 2020, in which the court determined the appropriate amount of attorney's fees for both the Aaron Parties and the Weston Parties.  Rose appealed this order.  The court will address Rose's appeal of the bankruptcy court's fee order in a separate opinion.

Shortly after the bankruptcy court's rulings, the Weston Parties filed a Motion to Amend Findings of Fact and Conclusions of Law and Motion to Amend Judgment, seeking reconsideration of their conspiracy, aiding and abetting, and equitable subordination claims.  On September 27, 2019, the bankruptcy court granted the motion in part and determined that the Weston Parties had prevailed on their equitable subordination claim against Rose, but not against the Aarons.  The bankruptcy court amended its Memorandum Opinion accordingly.

The Rose Parties filed their notice of appeal on October 2, 2019, appealing from the bankruptcy court's Order entered January 23, 2019, Memorandum Opinion entered January 23, 2019, Amended Order entered September 27, 2019, Memorandum Opinion and Orders Regarding Motions to Reconsider entered September 27, 2019, and Amended Memorandum Opinion entered September 27, 2019.  Subsequently, on October 8, 2019, the Weston Parties filed their notice of cross-appeal regarding the same September 27, 2019, orders.

II.   Standard of Review

District courts have jurisdiction to hear appeals from "final judgments, orders, and decrees" and, with leave of the court, "other interlocutory orders and decrees" of bankruptcy judges.  28 U.S.C. § 158(a).  Pursuant to 28 U.S.C. § 158(c)(2), an appeal from the bankruptcy court to the district court "shall be taken in the same manner as appeals in civil proceedings generally are taken to the courts of appeals from the district courts."  *Id.*  Therefore, "when reviewing a bankruptcy court's decision in a 'core proceeding,' a district court functions as a[n] appellate court."[10] *First Nat'l Bank v. Crescent Elec. Supply Co. (In re Renaissance Hosp. Grand*

_____

[10] The bankruptcy court exercised core jurisdiction over these matters pursuant to 28 U.S.C. §§ 1334 and 157(b)(2)(A), (B), and (I).

*Prairie Inc.)*, 713 F.3d 285, 293 (5th Cir. 2013) (quoting *Webb v. Reserve Life Ins. Co. (In re Webb)*, 954 F.2d 1102, 1103-04 (5th Cir. 1992)); *accord Perry v. Dearing (In re Perry)*, 345 F.3d 303, 308-09 (5th Cir. 2003); *RSL Funding, LLC v. Date (In re Date)*, No. AP 15-03185, 2020 WL 7059872, at \*5 (S.D. Tex. Dec. 1, 2020).

When reviewing a decision of the bankruptcy court, the court must accept the bankruptcy court's findings of fact unless clearly erroneous and examine the bankruptcy court's conclusions of law *de novo*. *Galaz v. Galaz (In re Galaz)*, 850 F.3d 800, 804 (5th Cir. 2017); *Monge v. Rojas (In re Monge)*, 826 F.3d 250, 254 (5th Cir. 2016); *In re Renaissance Hosp. Grand Prairie Inc.*, 713 F.3d at 293-94; *Halo Wireless, Inc. v. Alenco Commc'ns, Inc. (In re Halo Wireless, Inc.)*, 684 F.3d 581, 586 (5th Cir. 2012). Mixed questions of law and fact are reviewed *de novo*. *In re Renaissance Hosp. Grand Prairie Inc.*, 713 F.3d at 294; *Tech. Lending Partners, LLC v. San Patricio Cnty. Cmty. Action Agency (In re San Patricio Cnty. Cmty. Action Agency)*, 575 F.3d 553, 557 (5th Cir. 2009). "When a finding of fact is premised on an improper legal standard, or a proper one improperly applied, however, that finding is reviewed *de novo*." *Stone v. Viegelahn (In re Stone)*, 814 F. App'x 857, 858 (5th Cir. 2020); *Suggs v. Stanley (In re Stanley)*, 224 F. App'x 343, 346 (5th Cir. 2007), *cert. denied*, 552 U.S. 1182 (2008). A finding of fact is clearly erroneous when although there is evidence to support it, the reviewing court is left with a firm and definite conviction that a mistake has been committed. *Saenz v. Gomez (In re Saenz)*, 899 F.3d 384, 395 (5th Cir. 2018) (quoting *Otto Candies, L.L.C. v. Nippon Kaiji Kyokai Corp.*, 346 F.3d 530, 533 (5th Cir. 2003), *cert. denied*, 541 U.S. 1009 (2004)); *In re Renaissance Hosp. Grand Prairie Inc.*, 713 F.3d at 293-94 (citing *Anderson v. City of Bessemer City*, 470 U.S. 564, 573-74 (1985)). The clearly erroneous standard "plainly does not entitle a reviewing court to reverse the

11

finding of the trier of fact simply because it is convinced that it would have decided the case differently." *In re Renaissance Hosp. Grand Prairie Inc.*, 713 F.3d at 293 (citing *Anderson*, 470 U.S. at 573-74).

Moreover, a bankruptcy court's damages award "is a finding of fact, which this court reviews for clear error." *Eni US Operating Co., Inc. v. Transocean Offshore Deepwater Drilling, Inc.*, 919 F.3d 931, 941 (5th Cir. 2019) (quoting *Jauch v. Nautical Servs., Inc.*, 470 F.3d 207, 213 (5th Cir. 2006)). The conclusions of law underlying the award, however, are reviewed *de novo*. *Id.* "[A] bankruptcy court's findings based on credibility determinations are entitled to significant weight because the bankruptcy judge is 'in a far superior position to gauge [the witnesses'] credibility' than a court reviewing only the cold record." *Harwood v. FNFS, Ltd. (In re Harwood)*, 427 B.R. 392, 396 (E.D. Tex. 2010) (quoting *Gen. Elec. Power Co. v. Acosta (In re Acosta)*, 406 F.3d 367, 373 (5th Cir. 2005)), *aff'd*, 637 F.3d 615 (5th Cir. 2011); *accord Scarbrough v. Purser (In re Scarbrough)*, 836 F.3d 447, 455 (5th Cir. 2016).

III.    Rose's Appeal of Adversary Case No. 17-04104

The Rose Parties appeal from the bankruptcy court's judgment in favor of the Aaron Parties. In their appeal, the Rose Parties complain that the bankruptcy court erred in awarding the Aarons over $1.1 million in actual damages for breach of the lease agreement, finding that Rose committed theft by "coercion" under the TTLA, and awarding McLaughlin $51,200.00 in damages that were premised on his alleged "conclusory" testimony.

A.    The Aarons' Damages Award

The Rose Parties contest the bankruptcy court's damages award in favor of the Aarons on the following grounds: the Aarons did not actually incur such damages; the Aarons do not have

the standing, capacity, or any other right to recover damages incurred by Broken Arrow; and the bankruptcy court did not apply a recognized measure of damages.  Although the court disagrees with the Rose Parties' allegations that the Aarons did not incur damages separate from Broken Arrow, it agrees that the bankruptcy court failed to apply an appropriate measure of damages when it awarded the Aarons $1,109,000.00 for injuries caused by Rose's breach of the Lease.

        1.    The Aarons' Right to Recover Damages

The Rose Parties argue that the Aarons did not incur or sustain any pecuniary loss and, accordingly, failed to establish an essential element of their claim.  The Aaron Parties contend that the Rose Parties' complaints about the bankruptcy court's damages award constitute issues of fact that mandate the "clearly erroneous" standard of review.  Accordingly, the Aaron Parties argue that the Rose Parties have failed to establish that the bankruptcy court committed clear error in its damages findings and award.

As part of a valid breach of contract claim, a plaintiff must prove that he or she "sustained damages due to the breach." *Pathfinder Oil & Gas, Inc. v. Great W. Drilling, Ltd.*, 574 S.W.3d 882, 890 (Tex. 2019); *USAA Tex. Lloyds Co. v. Menchaca*, 545 S.W.3d 479, 502 n.21 (Tex. 2018); *accord Lamar Cnty. Elec. Coop. Ass'n v. McInnis Bros. Constr., Inc.*, No. 4:20-CV-930, 2021 WL 1061188, at *5 (E.D. Tex. Mar. 19, 2021).  According to the Texas Supreme Court, "[t]he universal rule for measuring damages for the breach of a contract is just compensation for the loss or damage actually sustained." *Stewart v. Basey*, 245 S.W.2d 484, 486 (Tex. 1952); *accord Hooks v. Samson Lone Star, Ltd. P'ship*, 457 S.W.3d 52, 68 (Tex. 2015).  In its Memorandum Opinion, the bankruptcy court concluded:

> The Aarons presented sufficient and credible evidence establishing that they paid at least $1,109,000.00 for improvements to the Aaron Ranch. . . .  Lori Aaron's

13

> unequivocal testimony regarding the damages caused by Rose's preventing them
> access to the Gainesville Ranch concerns actual amounts paid by the Aarons to
> improve the Commerce ranch.

The court reviews the factual basis of the bankruptcy court's conclusion for clear error and the conclusions of law underlying the award *de novo*. *Eni US Operating Co., Inc.*, 919 F.3d at 941.

The Rose Parties point to testimony elicited from Lori at trial, during which she was asked: "And do you know, ma'am, that the majority of these improvements and construction expenses that you're referring to, . . . the majority of those expenses were actually paid by Broken Arrow Cattle Company, correct?" Lori responded, "Yes. Those have always run like this, always." Later, Lori was asked: "Do you know of any amount that Aaron Ranch itself paid for any improvements out of the Aaron Ranch bank account for these improvements at the Commerce facilities?" Lori answered, "I can't tell you right now how it's broken out." The Rose Parties, however, overlook later testimony from Lori in which she was asked: "At the end of the day, does every penny that Broken Arrow spends on – or spent on these improvements come out of you and your husband's pockets?" Lori responded, "Yes, it does." Because the bankruptcy court was in a far superior position to make credibility determinations, the court gives significant weight to the bankruptcy court's evaluation of Lori's testimony. *See In re Scarbrough*, 836 F.3d at 455; *In re Harwood*, 427 B.R. at 396. Lori's testimony clearly indicates that the Aarons paid the expenses to remedy Rose's locking them out of the Gainesville Ranch out of their own pockets. The Rose Parties have not demonstrated that the bankruptcy court committed clear error in its factual determination that the Aarons "paid at least $1,109,000.00 for improvements to the Aaron Ranch" in response to Rose's breach. *See Eni US Operating Co., Inc.*, 919 F.3d at 941.

14

The Rose Parties further assert that the Aarons do not have the right to "recover money allegedly paid by Broken Arrow." Specifically, the Rose Parties argue that the Aarons cannot recover Broken Arrow's damages because it is a separate legal entity. Again, the Rose Parties' theory misses the mark. The Aarons were not awarded and, apparently, did not seek damages incurred by Broken Arrow.[11] Rather, the Aarons sought to recover damages that they incurred. Indeed, Lori, Phillip, and Aaron Ranch were the parties to the Lease, which served as the basis for their claim; Broken Arrow, however, was not a party to the Lease. The Aarons used Broken Arrow merely as an intermediary to cover the costs associated with the move from the Gainesville Ranch to the Commerce Ranch. Ultimately, however, every "penny" that the Aarons spent to remedy Rose's breach of the Lease came from their "pockets." Accordingly, the bankruptcy court expressly concluded that Lori, Phillip, and Aaron Ranch sustained the damages caused by Rose's breach of the Lease. In fact, the bankruptcy court never addressed Broken Arrow's damages. Rose has not demonstrated that the bankruptcy court committed clear error in its damages determination that the Aarons sustained injury from Rose's breach or that the determination is based on an incorrect legal standard. *See Eni US Operating Co., Inc.*, 919 F.3d at 941.

## 2.    The Appropriate Measure of Damages

The Rose Parties also challenge the Aarons' damages award on the grounds that the bankruptcy court failed to apply a cognizable measure of damages. The Aaron Parties contend that the bankruptcy court "properly concluded that as a direct and natural result of Rose's breach,

---

[11] Rose spends a significant portion of her briefing discussing a partner's inability to recover damages incurred by the partnership. As Rose acknowledges, the Aarons do not argue that they should be able to recover Broken Arrow's damages, nor do they assert such an argument on appeal. Rather, the Aarons seek to recover only the damages they themselves incurred. Thus, the court will not address whether Lori and Phillip, as partners, could recover Broken Arrow's damages.

the Aarons were forced to incur expenses to accommodate the horses they purchased from Rose."
The Aaron Parties argue that the court should apply a clear error standard of review. Damages,
however, "must be measured by a legal standard, and that standard must be used to guide the
fact-finder in determining what sum would compensate the injured party." *Sharifi v. Steen Auto.,
LLC*, 370 S.W.3d 126, 148 (Tex. App.—Dallas 2012, no pet.); *accord David Hoppenstein Fam.,
Ltd. v. Zargaran*, No. 05-16-01376-CV, 2018 WL 2926376, at *6 (Tex. App.—Dallas June 8,
2018, no pet.) (mem. op.). Accordingly, "[d]etermining the proper measure of damages is a
question of law for the court." *Parkway Dental Assocs., P.A. v. Ho & Huang Props., L.P.*, 391
S.W.3d 596, 607 (Tex. App.—Houston [14th Dist.] 2012, no pet.). As a question of law, the
court will apply the *de novo* standard of review to determine whether the bankruptcy court applied
the correct measure of damages. *See Eni US Operating Co., Inc.*, 919 F.3d at 941.

"The goal in measuring damages for a breach-of-contract claim is to provide just
compensation for any loss or damage actually sustained as a result of the breach." *Parkway
Dental Assocs., P.A.*, 391 S.W.3d at 607. Accordingly, "[t]he universal rule for measuring
damages for the breach of a contract is just compensation for the loss or damage actually
sustained." *CQ, Inc. v. TXU Min. Co., L.P.*, 565 F.3d 268, 278 (5th Cir. 2009) (quoting *Abraxas
Petroleum Corp. v. Hornburg*, 20 S.W.3d 741, 760 (Tex. App.—El Paso 2000, no pet.)). Thus,
"a party generally should be awarded neither less nor more than his actual damages." *Id.*; *Sharifi*,
370 S.W.3d at 148.

16

"Damages for breach of contract protect three interests:  a restitution interest, a reliance interest, and an expectation interest."[12]  *Sharifi*, 370 S.W.3d at 148 (quoting *Chung v. Lee*, 193 S.W.3d 729, 733 (Tex. App.—Dallas 2006, pet. denied)); *accord Norhill Energy LLC v. McDaniel*, 517 S.W.3d 910, 917 (Tex. App.—Fort Worth 2017, pet. denied); *see also Hector Martinez & Co. v. S. Pac. Transp. Co.*, 606 F.2d 106, 108 n.3 (5th Cir. 1979), *cert. denied*, 446 U.S. 982 (1980).  Expectancy damages "restore the injured party to the economic position it would have occupied had the contract been performed."  *Parkway Dental Assocs., P.A.*, 391 S.W.3d at 607.  Reliance damages, on the other hand, "put the injured party in as good an economic position as it would have occupied had the contract not been made."  *Id.* at 607-08; *accord Zenor v. El Paso Healthcare Sys., Ltd.*, 176 F.3d 847, 866 (5th Cir. 1999) ("Reliance damages seek to put the injured party in the position he would have been in had he not relied on the promise.").

In a breach of contract case, an injured party may recover either expectation or reliance damages, but not both.  *Transverse, L.L.C. v. Iowa Wireless Servs., L.L.C.*, 617 F. App'x 272, 280 (5th Cir. 2015); *Amigo Broad., LP v. Spanish Broad. Sys., Inc.*, 521 F.3d 472, 485 (5th Cir. 2008) (citing RESTATEMENT (SECOND) OF CONTRACTS § 349 (1981)); *Siam v. Mt. Vista Builders*, 544 S.W.3d 504, 516 (Tex. App.—El Paso 2018, no pet.).  "A party is entitled to sue and seek damages on alternative theories but is not entitled to recover on both theories; to do so is considered equivalent to a 'double recovery.'"  *Sharifi*, 370 S.W.3d at 149 (quoting *Foley v.*

---

[12] The parties do not contend that restitution damages should be awarded in this case, and no evidence in the record suggests that restitution damages are appropriate.

17

*Parlier*, 68 S.W.3d 870, 884 (Tex. App.—Fort Worth 2002, no pet.)).  Thus, "[a] plaintiff who has two inconsistent remedies must elect between them."  *Id.*

In this instance, the Aaron Parties claim that the bankruptcy court applied the reliance method of calculating damages although the bankruptcy court does not specify the method utilized. Reliance damages "reimburse one for expenditures made towards the execution of the contract in order to restore the status quo before the contract."  *Sharifi*, 370 S.W.3d at 149; *accord Amigo Broad., LP*, 521 F.3d at 485.  Thus, reliance damages "include expenditures made in preparation for performance or in performance, less any loss that the party in breach can prove with reasonable certainty the injured party would have suffered had the contract been performed." *Nutrasep LLC v. TOPC Tex. LLC*, 309 F. App'x 789, 792 n.14 (5th Cir. 2008); *Siam*, 544 S.W.3d at 516.  Accordingly, any expenditures made after the breaching party repudiates an obligation "cannot reasonably be said to have been in reliance" on the obligation.  *Conner v. Lavaca Hosp. Dist.*, 267 F.3d 426, 436 (5th Cir. 2001) (noting that reliance on a contract is not reasonable after the other party unequivocally repudiates its obligations); *see Universal Truckload, Inc. v. Dalton Logistics, Inc.*, 946 F.3d 689, 697 (5th Cir. 2020) (recognizing the holding in *Conner*).

Here, after Rose breached the Lease by locking the Aarons out of the Gainesville Ranch, rather than look for a comparable property to lease, the Aarons decided to make permanent improvements to their Commerce Ranch in order to accommodate their horse-breeding operations. Evidence elicited at trial reveals that the Aarons spent funds on improving fencing, purchasing equipment, building a breeding barn, and making other improvements, including installing concrete, a pond, new offices, lighting, furniture, pens, paddocks, and other structures.  Lori

testified that at a "minimum" the improvements to the Commerce Ranch cost a total of $1,109,000.00.  In awarding the Aarons their requested damages for improvements to the Commerce Ranch, the bankruptcy court concluded that the improvements "were reasonable and necessary to accommodate the horses and to continue the breeding program they had planned to conduct at the Gainesville Ranch."

By awarding the Aarons the cost of making permanent improvements to their Commerce Ranch, the bankruptcy court failed to put the Aarons in the position in which they would have been had they not entered into the Lease.  *See Range v. Calvary Christian Fellowship*, 530 S.W.3d 818, 831 (Tex. App.—Houston [14th Dist.] 2017, pet. denied) (rejecting a theory of reliance damages that amounted to the cost to buy land and build a new facility considering "the damages [the plaintiffs] sought could not be reliance damages, because these amounts would not restore [the plaintiffs] to the positions they occupied before [the breach], but would instead enrich them by more than $1.87 million").  If the Aarons had not entered into the Lease with Rose, they would not have had access to any of the facilities or equipment at the Gainesville Ranch that they sought to replicate at their Commerce Ranch.  The $1,109,000.00 in improvements were not made in reliance on the lease; rather, they were made as a result of Rose's breach.  Moreover, as Rose breached the parties' Lease when she locked the Aarons out of the Gainesville Ranch, any amount spent afterward to remedy the breach cannot be said to be in reliance on the Lease.  *See Conner*, 267 F.3d at 436; *Universal Truckload, Inc.*, 946 F.3d at 697.

19

Instead of applying the reliance measure, the bankruptcy court apparently applied the expectancy method of calculating damages.[13]  The expectancy measure of calculating damages seeks "to restore the injured party to the economic position it would have occupied had the contract been performed."  *First Cash, Ltd. v. JQ-Parkdale, LLC*, 538 S.W.3d 189, 201 (Tex. App.—Corpus Christi-Edinburg 2018, no pet.); *see Elsas v. Yakkassippi, L.L.C.*, 746 F. App'x 344, 348 (5th Cir. 2018); *Sharifi*, 370 S.W.3d at 148.  "To restore an injured party to the position she would have been in had the contract been performed, it must be determined what additions to the injured party's wealth have been prevented by the breach and what subtractions from her wealth have been caused by it."  *Picard v. Badgett*, No. 14-19-00006-CV, 2021 WL 786817, at *17 (Tex. App.—Houston [14th Dist.] Mar. 2, 2021, no pet.) (mem. op.); *Sharifi*, 370 S.W.3d at 148.

In the breach of lease context, Texas courts recognize that "one potential measure of the leaseholder's expectancy damages is the rent differential."  *First Cash, Ltd.*, 538 S.W.3d at 201. Contrary to Rose's assertions, no Texas authority suggests that the rent differential method is mandatory in cases where it can be applied.  Thus, absent contrary authority, a plaintiff may elect any permissible measure of damages, including the rent differential, but is not required to do so if other methods are available.  *Sharifi*, 370 S.W.3d at 149.  Therefore, it was not erroneous for the bankruptcy court to elect not to apply the rent differential method of calculating damages.

---

[13] The bankruptcy court concluded: "If the Lease had not been terminated, the Aarons *would have had* the use of the Gainesville Ranch for their new performance quarter horse business for five years as well as the use of the Aaron Ranch in Commerce for their existing business. . . . Rose's termination of the Lease also forced the Aarons to spend large sums of money right away rather than spreading out payments over five years."  Although the bankruptcy court did not expressly adopt the expectancy measure of damages, its statements are consistent with the application of this measure of damages.

The bankruptcy court, however, failed to apply the expectancy measure of calculating damages correctly. Under the terms of the Lease, the Aarons leased the Gainesville Ranch for five years in return for monthly lease payments of $41,666.67, for a total payment of $2.5 million. Thus, had the lease been fully performed, the Aarons would have had the use of the Gainesville Ranch for five years and would have expended $2.5 million in lease payments.[14] Rather than place the Aarons in the position of having the use of the Gainesville Ranch for five years, the bankruptcy court awarded the Aarons the cost of permanent improvements to the Commerce Ranch. The bankruptcy court failed to account for the amount in lease payments that the Aarons were not required to make.[15] Accordingly, the bankruptcy court's damages award appears to have placed the Aarons in a better position than they would have been in had the Lease been fully performed. *See Reavis v. Taylor*, 162 S.W.2d 1030, 1038 (Tex. App.—Eastland 1942, writ ref'd w.o.m.) (finding that the plaintiff's damages were properly reduced by the amount of unpaid rent because, "[a]lthough evicted from the premises, [the plaintiff] profited or was saved the expenditure of said $480, unpaid rental on the lease contract").

Hence, the bankruptcy court did not correctly apply either the reliance or expectancy methods of calculating damages, and, therefore, erred in its damages award. Applying the *de*

---

[14] The Aarons made their monthly lease payments in August, September, and October 2013. The bankruptcy court concluded that Rose breached the parties' lease when she locked the Aarons out of the Gainesville Ranch on October 3, 2013. The record does not indicate that any additional lease payments were made after October 2013. Thus, it would appear that the Aarons paid approximately $125,000.00 in lease payments, leaving $2,375,000.00 in payments remaining on the Lease.

[15] The bankruptcy court also did not decrease the damages award for any increase in value of the Commerce Ranch as a result of the permanent improvements. The bankruptcy court, however, concluded that, at trial, "there was insufficient evidence of the increase in value, if any, attributable to the improvements the Aarons made to the Aaron Ranch." Rose does not contest this conclusion of the bankruptcy court.

*novo* standard of review, the court reverses the bankruptcy court's damages award of $1,109,000.00 as it relates to the Aaron Parties' breach of contract claim.[16]

### B.    The Aarons' TTLA Claim

In their second issue, the Rose Parties contend that "[t]he bankruptcy court also erred by finding that Rose committed theft by 'coercion' under the TTLA because she retained possession of the Aarons' horses under a valid stableman's lien." The Aaron Parties, on the other hand, argue that the bankruptcy court correctly applied the statutory definition of coercion and urge the court to find that Rose's actions violated the TTLA.

The TTLA "provides victims of a theft, as defined in various sections of the Texas Penal Code, with a civil action to recover damages, fees, and costs from the thief." *Powers v. Caremark Inc. (In re Powers),* 261 F. App'x 719, 721 (5th Cir. 2008); *see Walterscheid v. Walterscheid,*

---

[16] Because the court reverses the bankruptcy court's damages award, it need not address whether there is legally sufficient evidence supporting the bankruptcy court's current award. Nevertheless, the court notes that the bankruptcy court's determination regarding the cost of improvements to the Commerce Ranch is not supported by legally sufficient evidence. Under Texas law, "[i]t is well settled that damages cannot be established merely through speculation or conjecture." *Sanders v. Flanders*, 564 F. App'x 742, 744 (5th Cir. 2014). Thus, damages must be ascertainable "by reference to some fairly definite standard, established experience, or direct inference from known facts." *Tate v. Goins, Underkofler, Crawford & Langdon*, 24 S.W.3d 627, 635 (Tex. App.—Dallas 2000, pet. denied); *see In re M.G.G.*, No. 05-19-00777-CV, 2020 WL 4581646, at *5 (Tex. App.—Dallas Aug. 10, 2020, no pet.) (mem. op.); *Lake v. Cravens*, 488 S.W.3d 867, 906 (Tex. App.—San Antonio 2016, no pet.). Accordingly, a damages award cannot be based on a vague, general statement, that provides no accompanying figures, data, or explanation as to how the amount of damages is calculated. *Sanders*, 564 F. App'x at 746. Moreover, the plaintiff has the burden to prove that expenses are both reasonable and necessary. *McGinty v. Hennen*, 372 S.W.3d 625, 627 (Tex. 2012); *Mustang Pipeline Co. v. Driver Pipeline Co.*, 134 S.W.3d 195, 200-01 (Tex. 2004). According to Texas courts, "[e]vidence of the amounts charged and paid, standing alone, is no evidence that such payment was reasonable and necessary." *Mustang Pipeline Co.*, 134 S.W.3d at 200-01; *see McGinty*, 372 S.W.3d at 627; *Knight Renovations, LLC v. Thomas*, 525 S.W.3d 446, 453 (Tex. App.—Tyler 2017, no pet.). No evidence was presented at trial regarding the reasonableness and necessity of the improvements to the Commerce Ranch. Indeed, many of the photographs presented at trial depict lavish upgrades to the Commerce Ranch that may be neither reasonable nor necessary.

557 S.W.3d 245, 263 (Tex. App.—Fort Worth 2018, no pet.).  Specifically, the TTLA provides

that "a person who commits theft is liable for damages resulting from the theft."  TEX. CIV. PRAC.

& REM. CODE § 134.004; *see McCullough v. Scarbrough, Medlin & Assocs., Inc.*, 435 S.W.3d

871, 906 (Tex. App.—Dallas 2014, pet. denied).  The TTLA defines "theft" as "unlawfully

appropriating property or unlawfully obtaining services as described by Section 31.03" of the

Texas Penal Code.  *Id*. § 134.002.  Section 31.03 states that "[a] person commits an offense if he

unlawfully appropriates property with intent to deprive the owner of property."  TEX. PENAL

CODE § 31.03.  Further, "[a]ppropriation of property is unlawful if . . . it is without the owner's

effective consent."  *Id*.  "Consent is not effective if . . . induced by deception or coercion."  *Id*.

§ 31.01.  The Texas Penal Code additionally provides:

> (9) "Coercion" means a threat, however communicated:
>     (A) to commit an offense;
>     (B) to inflict bodily injury in the future on the person threatened or another;
>     (C) to accuse a person of any offense;
>     (D) to expose a person to hatred, contempt, or ridicule;
>     (E) to harm the credit or business repute of any person; or
>     (F) to take or withhold action as a public servant, or to cause a public
>     servant to take or withhold action.

*Id*. § 1.07(a)(9); *Evans v. State*, 220 S.W.3d 54, 56 (Tex. App.—San Antonio 2006, pet. ref'd)

(applying § 1.07(a)(9)'s definition of "coercion" to § 31.03).  "Deception," on the other hand,

is defined as "creating or confirming by words or conduct a false impression of law or fact that

is likely to affect the judgment of another in the transaction, and that the actor does not believe to

be true."[17]  TEX. PENAL CODE § 31.01(1)(A).

---

[17] The bankruptcy court concluded that Rose "did not deceive the Aarons as to the fact that she was demanding $61,257.32 over-and-above the amounts related to the care and grazing of their horses." Neither party challenged this conclusion.

In its Memorandum Opinion, the bankruptcy court concluded that "under the circumstances, Rose violated TTLA and coerced payment by depriving the Aarons of their horses until they agreed to pay her everything she demanded." The bankruptcy court reasoned that Rose "coerced [the Aarons] to pay the full amount she believed she was owed under the Agreements by refusing to release their horses from the Gainesville Ranch."

The Rose Parties contend that "the bankruptcy court was required to find that Rose threatened to do one or more of the acts delineated in Section 1.07(a)(9)" and that it "made no findings that any of those acts occurred." The court agrees. The bankruptcy court did not expressly conclude that Rose committed any of the acts constituting "coercion" under Section 1.07(a)(9). The Aaron Parties cite to case law suggesting that the court should "presume that district courts know applicable law and apply it correctly."[18] Under Federal Rule of Civil Procedure 52(a),[19] "implicit findings will not automatically be inferred to support a conclusory ultimate finding." *Eni US Operating Co., Inc.*, 919 F.3d at 936. Rather, the trial court "must lay out enough subsidiary findings to allow [the reviewing court] to glean 'a clear understanding of the analytical process by which the ultimate findings were reached and to assure [the court] that the trial court took care in ascertaining the facts.'" *Id*. (quoting *Golf City, Inc. v. Wilson Sporting*

---

[18] The case upon which the Aaron Parties rely deals with criminal sentencing and the factors set forth in 18 U.S.C. § 3553(a).

[19] Federal Rule of Civil Procedure 52(a) applies in adversary proceedings under Bankruptcy Rule 7052. *See* Fed. R. Bankr. P. 7052 ("Rule 52 F. R. Civ. P. applies in adversary proceedings, except that any motion under subdivision (b) of that rule for amended or additional findings shall be filed no later than 14 days after entry of judgment."); *see also Garner v. Knoll, Inc. (In re Tusa-Expo Holdings, Inc.)*, 811 F.3d 786, 789 n.1 (5th Cir. 2016); *Luce v. First Equip. Leasing Corp. (In re Luce)*, 960 F.2d 1277, 1284 (5th Cir. 1992).

*Goods, Co.*, 555 F.2d 426, 433 (5th Cir. 1977)).  While the court is confident that the bankruptcy court knows the law, the Memorandum Opinion lacks findings that allow the court to glean a clear understanding of the analytical process by which the bankruptcy court determined that Rose committed theft by "coercion," as that term is defined by the Texas Penal Code.  Accordingly, in the absence of explicit findings, the court cannot conclude that the bankruptcy court properly found that Rose violated the TTLA by means of "coercion" in this context.

Rose further maintains that under Texas law governing stableman's liens, "Rose had the absolute possessory right over all of the horses because the Aarons conceded some amounts were owed under" Rose's stableman's lien, and, accordingly, Rose's actions could not constitute theft. The Texas Property Code provides that "[a] stable keeper with whom an animal is left for care has a lien on the animal for the amount of the charges for the care."  TEX. PROP. CODE § 70.003. "These liens attach while the customer's property is in the possession of the tradesperson." *Mossman v. Banatex, LLC*, 479 S.W.3d 854, 860 (Tex. App.—El Paso 2015, no pet.).  Thus, a stable keeper "may retain possession of the [animal] until the amount due under the contract for [its care] has been paid." *Mossman*, 479 S.W.3d at 860 (recognizing the similarity between § 70.001 liens and § 70.003 liens).

Relevant here, coercion is defined as a threat to commit an offense.  TEX. PENAL CODE § 1.07(a)(9).  Although the bankruptcy court did not expressly define the threatened offense, the Aaron Parties contend that the offense is Rose's retention of the Aarons' horses.  The bankruptcy court concluded that of the $101,948.50 asserted by Rose as a stableman's lien, $40,691.18 in charges were actually owed by the Aarons for the care of the horses.  At trial, Rose's counsel

admitted that some of the charges asserted in the stableman's lien were "not legitimate." Thus, the question for the court is whether the additional $61,257.32 in charges that were "not legitimate" constitute theft as defined by the TTLA.

The bankruptcy court concluded, and the parties seemingly agree, that Rose was owed $40,691.18 for care and grazing of the horses. Thus, under the Texas Property Code, Rose had a right to a lien of $40,691.18 on the horses for the costs of their care. It was legally permissible for Rose to retain possession of the horses until the Aarons paid her $40,691.18. Because Rose asserted a stableman's lien, at least in part for charges associated with the care of the horses, she had the right to possess the horses until, at a minimum, the Aarons paid the amount they legitimately owed under the lien. Therefore, Rose did not threaten to commit an offense—retention of the horses—because she had a legal right to possess the horses at the time. The calculus might be different if the Aarons had paid Rose the amount she was legally owed for the care of the horses in her possession, $40,691.18, and she then continued to threaten to keep the horses if the Aarons refused to pay the remaining $61,267.32. The Aarons did not do this. Accordingly, Rose's behavior does not amount to "coercion" as defined by the Texas Penal Code.

Finally, the Rose Parties argue that "there is no evidence that Rose intended to deprive the Aarons of the excess charges or that the Aarons paid the excessive charges as a result of 'coercion.'"[20] Under the TTLA, "[t]he relevant intent to deprive is the person's intent at the time

_____

[20] The unlawful appropriation must be "induced by" coercion, demonstrating a causation requirement. TEX. PENAL CODE § 31.01(3)(a). Rose correctly points out that "[a] voluntary transfer cannot be theft under the [TTLA]." *See Hughes v. Montee*, No. 05-15-00129-CV, 2016 WL 3946887, at *4 (Tex. App.—Dallas July 18, 2016, pet. denied) (mem. op.) (citing *Beardmore v. Jacobsen*, 131 F. Supp. 3d 656, 669 (S.D. Tex. 2015)). The bankruptcy court did not address the causation issue, and the parties have not presented any evidence supporting causation.

of the taking." *McCullough*, 435 S.W.3d at 906 (citing *Wirth v. State*, 361 S.W.3d 694, 697 (Tex. Crim. App. 2012)); *accord Hui Ye v. Xiang Zhang*, No. 4:18-CV-4729, 2020 WL 2521292, at *12 (S.D. Tex. May 15, 2020); *Walterscheid*, 557 S.W.3d at 263.

Here, the bankruptcy court found that "Rose was less involved in the financial aspects of managing and running the Gainesville Ranch. Rose testified, credibly, that she is not an 'office person.' She relied on others to keep the books and records for her business." Moreover, Rose testified at trial: "I said in the very beginning that there were some errors in that stableman's lien." She insisted that since the issues were first brought to her attention she had maintained that "there were a few mistakes." Lori testified that "the attorneys were dealing with this issue" and that she was not "having any direct interaction with" Rose. Although Lori stated at trial that she paid the full amount "under full protest," there is no evidence in the record that she conveyed her "protest" to Rose or to any person other than her lawyer. Accordingly, the Aarons produced no evidence suggesting that Rose had an intent to deprive the Aarons of $61,267.32, and the bankruptcy court did not make any findings regarding Rose's intent.

In sum, the bankruptcy court failed to make certain findings required to support the Aarons' TTLA claim. Moreover, even if the bankruptcy court had made such findings, Rose's behavior does not appear to constitute "coercion" as defined by the Texas Penal Code. Accordingly, the court reverses the bankruptcy court's judgment in favor of the Aarons on their TTLA claim.

C.     McLaughlin's Judgment

The Rose Parties's final issue on appeal is that there is no evidence to support the bankruptcy court's award to McLaughlin of $51,200.00 for the diminution in value of the two fillies.  The Aaron Parties contend that the bankruptcy court's damages award to McLaughlin is supported "both factually and legally."

When personal property has been partially destroyed, "[t]he default rule for measuring direct damages is 'the difference in the market value immediately before and immediately after the injury to such property.'"  *J & D Towing, LLC v. Am. Alternative Ins. Corp.*, 478 S.W.3d 649, 656 (Tex. 2016); *Minshall v. Hartman Equine Reprod. Ctr., P.A.*, No. 4:15-CV-764, 2017 WL 2936299, at *2 (E.D. Tex. July 10, 2017).  "Market value is the price the property will bring when offered for sale by one who desires to sell, but is not obliged to sell, and is bought by one who desires to buy, but is under no necessity of buying."  *City of Harlingen v. Est. of Sharboneau*, 48 S.W.3d 177, 182 (Tex. 2001); *accord Hlavinka v. HSC Pipeline P'ship, LLC*, 605 S.W.3d 819, 837 (Tex. App.—Houston [1st Dist.] 2020, pet. filed); *Mian Dev. Corp. v. Texas*, No. 05-17-01385-CV, 2019 WL 6486282, at *8 (Tex. App.—Dallas Dec. 3, 2019, pet. denied) (mem. op.); *Williams v. Texas*, 406 S.W.3d 273, 284 (Tex. App.—San Antonio 2013, pet. denied).

Under Texas law, a property owner "may testify to the value of his property" so long as he "is personally familiar with his property and knows its fair market or fair rental value." *Mitropoulos v. Pineda*, No. 01-17-00795-CV, 2018 WL 6205855, at *7 (Tex. App.—Houston [1st Dist.] Nov. 29, 2018, no pet.) (mem. op.); *see Nat. Gas Pipeline Co. of Am. v. Justiss*, 397 S.W.3d 150, 155-56 (Tex. 2012); *Wood v. Kennedy*, 473 S.W.3d 329, 336-37 (Tex.

28

App.—Houston [14th Dist.] 2014, no pet.). Indeed, "[o]pinion testimony concerning [damages to property] is subject to the same requirements as any other opinion evidence, with one exception: the owner of the property can testify to its market value, even if he could not qualify to testify about the value of like property belonging to someone else." *Justiss*, 397 S.W.3d at 155 (quoting *Porras v. Craig*, 675 S.W.2d 503, 504 (Tex. 1984)); *see Spaulding v. Sumrall*, No. 09-16-00153-CV, 2018 WL 2339619, at *5 (Tex. App.—Beaumont May 24, 2018, pet. filed) (mem. op.). Therefore, while Texas law recognizes that the owner of property is qualified to testify regarding the fair market value of his property, to be admissible, his testimony must meet the same requirements as other expert testimony and must be based on market value rather than personal value. *See Justiss*, 397 S.W.3d at 156; *Porras*, 397 S.W.2d at 504; *Pineda*, 2018 WL 6205855, at *7 (citing *Wood*, 473 S.W.3d at 337) ("[A]n owner's valuation testimony is not relevant if it is conclusory or speculative."). Moreover, "even if unchallenged, the testimony must support a verdict, and conclusory or speculative statements do not." *Justiss*, 397 S.W.3d at 159.

> The bankruptcy court found:
>
> McLaughlin previously sold comparable horses for approximately $25,000.00 each. However, without the breeder's certificates, he testified that the two fillies are worth approximately $500.00 each. Thus, McLaughlin claims that Rose's refusal to sign and deliver the breeder's certificates damaged him in the amount of $51,200.00.

Accordingly, the bankruptcy court awarded McLaughlin damages in the amount of $51,200.00, concluding that "his testimony was credible and sufficient to establish his damages." The bankruptcy court further noted that "Rose did not submit any evidence contradicting his testimony."

During trial, counsel elicited the following testimony from McLaughlin:

Q:      That number[,] 51,200.  How did you arrive at that number?

A:      I have two unregistered, A Shiner Named Sioux fillies.  One is 5 years old, I believe, and one is 4 years old that Carol wouldn't sign the breeder certificates on.

Q:      And what value do the horses have, if they have the breeder's certificates?

A:      I sold the foal sibling for 25,000 and another foal sibling for 25,000.  So why wouldn't they be worth it?

Q:      But you were unable to sell these two horses because Ms. Rose refused to give you the registration certificates; is that what I understand your testimony to be?

A:      They're worth 500 bucks as a reset mare now.

Q:      Why is that?

A:      Well, they have no papers on them.  I can't breed them to a stallion like Blindsided, or anything like that, to try to get any money out of them because their colts wouldn't be registerable.

No other evidence regarding the value of the fillies was presented at trial.  McLaughlin's vague and speculative testimony does not establish the market value of the fillies before or after the breach.  *See Justiss*, 397 S.W.3d at 159.  McLaughlin did not indicate why he compared the two fillies he owned to the "foal siblings."  He did not identify the siblings by name, state their age or condition, or indicate when and where they were sold.  Indeed, McLaughlin's justification, "So why wouldn't they be worth it?," is the very type of vague and speculative testimony that cannot serve as the basis for a witness's valuation of property.  Further, McLaughlin failed to explain

how he concluded that the fillies were worth only $500.00 without their breeder certificates.[21]
Accordingly, McLaughlin's testimony cannot serve as the sole basis for the valuation of the two
fillies.  *See Whitmire v. Nat'l Cutting Horse Ass'n*, No. 02-11-00170-CV, 2012 WL 4815413, at
*8 (Tex. App.—Fort Worth Oct. 11, 2012, no pet.) (mem. op.) (sustaining an expert's valuation
of horses because he explained how various factors factored into his calculations, including the
"riding abilities on each of the three horses; the horses' physical compositions, performances, and
pedigrees; and auction results and sales prices for other horses").  Because neither the Aarons nor
McLaughlin provided additional evidence of the fillies' value, the bankruptcy court erred by
awarding McLaughlin $51,200.00 in damages for the loss in value of the fillies.

IV.    The Rose Parties' Appeal of Adversary Case No. 17-04131

The Rose Parties appeal from the bankruptcy court's judgment in favor of the Weston
Parties.   In their appeal, the Rose Parties complain that the bankruptcy court erred in:
(i) rendering judgment against Rose on the Weston Parties' claims based on a finding that Rose
misrepresented the Dispersal Sale as "without reserve;" (ii) awarding the Weston Parties
$437,918.12 as out-of-pocket, direct damages; (iii) awarding the Weston Parties rescission

---

[21] McLaughlin did not explain his value for the horses without the breeding certificates possibly
because his valuation was not logical given the fact that the horses were bred by a "famous" quarter horse
breeder and trained by himself.  *See In re Collier*, 419 S.W.3d 390, 404 (Tex. App.—Amarillo 2011, no
pet.) (sustaining the trial court's assessment that certain quarterhorses had a value of $4,000.00 each given
testimony that "the horses could sell for between $200 at a livestock auction to $7,500 if sold privately
with a little training put into the horse").

damages of $190,000.00 as to SHINERS LENA DOC; and (iv) determining that the judgment against Rose, individually, is non-dischargeable under 11 U.S.C. § 523(a)(2)(A).[22]

A.   Rose's Misrepresentation

In their first issue, the Rose Parties challenge the bankruptcy court's conclusion that Rose committed common law fraud, fraudulent inducement, and fraud by non-disclosure.  Under Texas law, a claim for common law fraud requires proof that a party (1) made a material representation that was false; (2) knew the representation was false or made it recklessly as a positive assertion without any knowledge of its truth; (3) intended to induce the other party to act upon the representation; and (4) the other party actually and justifiably relied upon the representation and thereby suffered injury.  *Ernst & Young, L.L.P. v. Pac. Mut. Life Ins. Co.*, 51 S.W.3d 573, 577 (Tex. 2001); *accord N. Cypress Med. Ctr. Operating Co., Ltd. v. Aetna Life Ins. Co.*, 898 F.3d 461, 474 (5th Cir. 2018); *Barrow-Shaver Res. Co. v. Carrizo Oil & Gas, Inc.*, 590 S.W.3d 471, 496 (Tex. 2019).  Fraudulent inducement is a type of fraud that requires the existence of a contract as part of its proof.  *Haase v. Glazner*, 62 S.W.3d 795, 798 (Tex. 2001); *accord Binh Hoa Le v. Exeter Fin. Corp.*, 990 F.3d 410, 415 n.11 (5th Cir. 2021).   "That is, with a fraudulent inducement claim, the elements of fraud must be established as they relate to an agreement between the parties."  *Haase*, 62 S.W.3d at 798-99; *see IAS Servs. Grp., L.L.C. v. Jim Buckley & Assocs., Inc.*, 900 F.3d 640, 647 (5th Cir. 2018).  Finally, fraud by nondisclosure, another subtype of fraud, requires that the plaintiff prove:  "(1) the defendant deliberately failed to disclose

---

[22] The Rose Parties devote one sentence to the fourth issue, in which they claim that the bankruptcy court's allegedly erroneous liability findings of "false pretenses" and "fraud" require reversal of its non-dischargeability finding.   As discussed in detail below, because the bankruptcy court's liability findings are not erroneous and are well supported by evidence in the record, the Rose Parties' singular challenge to the non-dischargeability finding is without merit.

material facts to the plaintiff that the defendant had a duty to disclose, (2) the defendant knew the plaintiff was ignorant of the facts and that the plaintiff did not have an equal opportunity to discover them, (3) by failing to disclose the facts, the defendant intended to induce the plaintiff to take some action or refrain from acting, and (4) the plaintiff relied on the nondisclosure and suffered injury as a result of that reliance." *Jang Won Cho v. Kun Sik Kim*, 572 S.W.3d 783, 801 (Tex. App.—Houston [14th Dist.] 2019, no pet.); *accord D'Onofrio v. Vacation Publ'ns, Inc.*, 888 F.3d 197, 218 (5th Cir. 2018); *E-Learning LLC v. AT&T Corp.*, 517 S.W.3d 849, 862 (Tex. App.—San Antonio 2017, no pet.).

### 1.   Evidence Supporting Rose's Misrepresentation

The Rose Parties first dispute the bankruptcy court's conclusion that Rose misrepresented that the Dispersal Sale was "without reserve," arguing that it is directly contrary to governing Texas law and the undisputed evidence.  The Weston Parties contend that the evidence supports the bankruptcy court's conclusion and that it did not clearly err in finding Rose explicitly misrepresented that her horses, tack, and equipment were put up for auction without reserve.  As part of their claims, the Weston Parties were required to prove that Rose made a material misrepresentation.

In its Memorandum Opinion, the bankruptcy court noted that Rose's "advertising an auction as a 'complete dispersal sale' but then conducting such an auction 'with reserves' was deceptive to the public, including Weston."  Based in part on this misrepresentation, the bankruptcy court concluded that Weston established claims for common law fraud, fraudulent inducement, and fraud by non-disclosure.  The court reviews the bankruptcy court's findings of fact under the clearly erroneous standard, conclusions of law *de novo*, and the applicability and

application of legal standards *de novo*. *Stone*, 814 F. App'x at 858; *In re Monge*, 826 F.3d at 254; *In re Renaissance Hosp. Grand Prairie Inc.*, 713 F.3d at 293-94; *In re Halo Wireless, Inc.*, 684 F.3d at 586; *In re Stanley*, 224 F. App'x at 346.

Section 2.328 of the Texas Business and Commerce Code, which governs sales by auction, provides that "a sale is with reserve unless the goods are in explicit terms put up without reserve.[23]" TEX. BUS. & COM. CODE § 2.328(c). Thus, under Section 2.328, an auction is presumed to be "with reserve" unless the goods are "in explicit terms" put up "without reserve." The statute, however, does not define the term "explicit." Words not statutorily defined "bear their common, ordinary meaning unless a different or more precise definition is apparent from the statutory context or the plain meaning yields an absurd result." *Paxton v. City of Dallas*, 509 S.W.3d 247, 256 (Tex. 2017); *accord Fort Worth Transp. Auth. v. Rodriguez*, 547 S.W.3d 830, 838 (Tex. 2018). "In determining the ordinary and common meaning of an undefined word in a statute, [the court] may consider a variety of sources, including dictionary definitions, judicial constructions of the term, and other statutory definitions." *Colorado Cnty. v. Staff*, 510 S.W.3d 435, 448 (Tex. 2017). Black's Law Dictionary defines "explicit" as "clear, open, direct, or exact," and "expressed without ambiguity or vagueness; leaving no doubt." BLACK'S LAW DICTIONARY (11th ed. 2019). Thus, the question before the bankruptcy court was whether Rose expressed without ambiguity or vagueness that the sale was without reserve. The bankruptcy court determined that advertising the auction as a "complete dispersal sale" was the equivalent of stating

---

[23] "In an auction with reserve the auctioneer may withdraw the goods at any time until he announces completion of the sale. In an auction without reserve, after the auctioneer calls for bids on an article or lot, that article or lot cannot be withdrawn unless no bid is made within a reasonable time. In either case a bidder may retract his bid until the auctioneer's announcement of completion of the sale, but a bidder's retraction does not revive any previous bid." TEX. BUS. & COM. CODE § 2.328.

that the sale was "without reserve."  The court does not find that the bankruptcy court committed error in this finding.

Beginning in 2013, Rose advertised a "complete dispersal sale" of her horse breeding operation, which was described at trial as "completely getting out of the business."  Rose advertised the auction as a "complete dispersal sale" on Facebook, on her company website, and through various other media outlets.  Additionally, the Sale Catalog advertised the auction as a "complete dispersal sale" in large, prominent, bold letters.

The Aaron Parties' auction expert, Mike Brandly ("Brandly"), testified at trial that the term "complete dispersal sale" means:

> [A]ll those horses are selling, we're getting out of business, we're moving on, and you have a chance to buy in an open, fair, equitable market where you can gauge value based on genuine intent to purchase [of] other bidders in the crowd.  It's a transparent market, if you will, there's no seller bidding . . . auctioneers [are] not running the bid, this is pure and simple market value and I got a shot at getting something.

Brandly continued, "If you're advertising complete dispersal sale, then this should have been conducted as a without reserve auction . . . .  [T]he intent of this text, 'complete dispersal sale,' is to tell the public, this is a without reserve auction."  Brandly opined that marketing an auction as a complete dispersal sale would "heighten attention, heighten participation, bigger crowds, bigger money, [and] better seller position."  Brandly's testimony[24] appears to be uncontroverted.

---

[24] The Rose Parties argue that Brandly's "testimony on a question of law exclusively for the court, statutory interpretation, is no evidence."  Brandly, however, did not offer an opinion regarding section 2.328; rather, he testified merely regarding the meaning of "complete dispersal sale."  Certainly, it was permissible for an auction expert to opine on what a term of art means within the auction industry.  *See Feld Motor Sports, Inc. v. Traxxas, LP*, No. 4:14-CV-463, 2015 WL 4722144, at *6 (E.D. Tex. Aug. 7, 2015) (allowing expert testimony regarding terminology used within a certain industry).

Moreover, the bankruptcy court was in a far superior position to gauge his credibility. *See In re Scarbrough*, 836 F.3d at 455; *In re Harwood*, 427 B.R. at 396.

The bankruptcy court also analyzed the ordinary meaning of "complete." Webster's Dictionary defines "complete" as "total, absolute." *Complete*, MERRIAM-WEBSTER'S COLLEGIATE DICTIONARY (11th ed. 2007). In accordance with this definition, the bankruptcy court reasoned that a "complete dispersal sale" was synonymous with an "absolute" sale. Section 67.70 of the Texas Administration Code, which governs the content of auction advertisements, equates "absolute" to "without reserve." *See* TEX. ADMIN. CODE § 67.70. Therefore, it was reasonable for the bankruptcy court to conclude that Rose's description of the event as a "complete dispersal sale" was the equivalent of announcing an "absolute" sale—thus, a sale "without reserve."

The minimal case law on this issue demonstrates that a seller need not use the express wording "without reserve" to make clear in explicit terms that an auction is without reserve. *See, e.g., St. Paul Oil & Gas Corp. v. Trijon Expl., Inc.*, 872 S.W.2d 27, 28 (Tex. App.—Corpus Christi-Edinburg 1994, writ denied) (finding that an "alleged misrepresentation that [the defendant] would sell the property interest to the highest bidder over $1 million is comparable to an auction 'without reserve'"); *Specialty Maint. & Const., Inc. v. Rosen Sys., Inc.*, 790 S.W.2d 835, 838 (Tex. App.—Houston [1st Dist.] 1990, no pet.) (noting that when an advertisement uses the terms "reserves" and "minimums" interchangeably, it would not be error if the jury concluded that the phrase "will be sold without minimum to the highest bidder" equated to "without reserve"). In the case at bar, because Rose advertised the auction as a "complete dispersal sale," the bankruptcy court did not err in finding that Rose explicitly misrepresented that the sale was without reserve.

36

2.    <u>Effect of the Parties' Contract on Rose's Misrepresentation</u>

The Rose Parties next argue that the Weston Parties' claims based on Rose's misrepresentation must fail because an enforceable contract "directly" contradicted her alleged misrepresentation or omission.  The Weston Parties seemingly assert that the contract upon which the Rose Parties wish to rely is not enforceable, and, even if it were enforceable, it does not contradict Rose's explicit misrepresentations.  Although the Rose Parties refer the court to correct principles of law regarding reliance on representations contrary to a written contract,[25] these issues are not implicated here.  *See JPMorgan Chase Bank, N.A.*, 546 S.W.3d at 659 ("[T]here is no direct contradiction if a reasonable person can read the writing and still plausibly claim to believe the earlier representation.").

Prior to the Dispersal Sale, Rose disseminated a Sale Catalog that contained the terms and conditions of the Dispersal Sale.  The terms and conditions provided, in part, that "[t]he right to bid is reserved for all consignors unless otherwise announced."  Although the Sale Catalog is not an enforceable contract on its own, the Rose Parties contend that its terms are incorporated in the Registration Agreement and the Acknowledgments of Purchase, both of which Weston signed.

---

[25] Under Texas law, "a party who enters into a written contract while relying on a contrary oral agreement does so at its peril and is not rewarded with a claim for fraudulent inducement when the other party seeks to invoke its rights under the contract."  *Mercedes-Benz USA, LLC v. Carduco, Inc.*, 583 S.W.3d 553, 559 (Tex. 2019) (quoting *DRC Parts & Accessories, L.L.C. v. VM Motori, S.P.A.*, 112 S.W.3d 854, 859 (Tex. App.—Houston [14th Dist.] 2003, pet. denied)).  Thus, according to the Texas Supreme Court, "there can be no justifiable reliance as a matter of law" when a plaintiff's claim "is directly contradicted by the contract's terms."  *Carduco, Inc.*, 583 S.W.3d at 559; *see JPMorgan Chase Bank, N.A. v. Orca Assets G.P., L.L.C.*, 546 S.W.3d 648, 658 (Tex. 2018) ("[A]s Texas courts have repeatedly held, a party to a written contract cannot justifiably rely on oral misrepresentations regarding the contract's unambiguous terms." (quoting *Nat'l Prop. Holdings, L.P. v. Westergren*, 453 S.W.3d 419, 424-25 (Tex. 2015))).

The Weston Parties argue that "there was no meeting of the minds between the parties as to the essential terms of any agreement."

Although the bankruptcy court did not explicitly find that Weston and Rose entered into a contract, it concluded that Weston established a claim for fraudulent inducement, which requires, as one of its elements, the existence of a contract. *See Binh Hoa Le*, 990 F.3d at 415 n.11; *Haase*, 62 S.W.3d at 798. Prior to the auction, Weston signed a Buyer's Registration and Sale Conditions Agreement that expressly incorporated the "General Information," "Special Notices," and "Conditions of Sale" sections of the Sale Catalog. Likewise, upon winning the horses at auction, Weston executed an Acknowledgment of Purchase, which incorporated by reference the same provisions. Thus, even though the bankruptcy court did not expressly conclude that Weston was contractually bound by the relevant terms of the Sale Catalog, it appears that she was bound by and, at the very least, was put on notice of the challenged provision.

Nevertheless, the court need not determine whether Weston was contractually bound by the challenged provision because, even if she were, that does not affect her claims. The relevant provision of the Sale Catalog provides: "The right to bid is reserved for all consignors unless otherwise announced." In its Memorandum Opinion, the bankruptcy court concluded:

> [I]t was "otherwise announced" that there would be no reserve. In fact, it was otherwise announced in large prominent bold letters in the sale catalog through the repeated use of the term "complete dispersal sale." This general announcement was reinforced by the specific announcement that the last horse of the day, [YURS N MINE], was the only horse with a reserve.

The court agrees with this analysis.

As previously discussed, when Rose represented that the Dispersal Sale was a "complete dispersal sale," including in large, prominent, bold letters in the Sale Catalog, she explicitly

misrepresented that the sale was without reserve.  Moreover, the bankruptcy court concluded that "it was represented to the audience by Green, with Brown, Rose, Lewis Stevens and Victor Clark present, that only the last horse in the auction (YURS N MINE . . .) was sold with a reserve price."  This conclusion is supported by Brandly's testimony at trial:

> It was otherwise advertised in several ways; on the cover of the catalog the third page of the catalog, the auctioneers when they got to the last horse announced that this was the only horse selling with reserves, so I just – I – I repeated to the people in attendance that all of these horses sold without reserve because that's the only horse, rather – that is selling with reserve.  I have close employees, contractors, auctioneers all reporting, telling me that this is an absolute auction.  So, I've – it – if the question, is it otherwise announced, it's only otherwise been announced a dozen ways.

Thus, it was not improper for the bankruptcy court to conclude that Rose "otherwise announced" that the auction was without reserve.  Because a reasonable person can read the Sale Catalog and still plausibly claim to believe the earlier representation that the auction was without reserve, there is no direct contradiction.  *See JPMorgan Chase Bank, N.A.*, 546 S.W.3d at 659.  Accordingly, Rose's Sale Catalog, regardless of whether it is legally binding, does not preclude the Weston Parties' claims based on Rose's misrepresentations.

        3.    <u>Causation Element of the Weston Parties' Misrepresentation Claims</u>

Finally, the Rose Parties contend that the evidence is legally insufficient to establish causation with regard to the Weston Parties' claims based on Rose's alleged misrepresentations. The Weston Parties argue that the bankruptcy court did not err in concluding that Weston's injuries were the direct result of Rose's misrepresentations and omissions.  In its Memorandum Opinion, the bankruptcy court concluded that "Weston's bids on the horses she purchased at the

auction were influenced [by] Rose's material omissions as well as her material and false representations, and, therefore, the omissions and misrepresentations caused injury to Weston."

As part of their fraud-based claims, the Weston Parties were required to prove causation. *See Pogue v. Williamson*, 605 S.W.3d 656, 665 (Tex. App.—Houston [1st Dist.] 2020, no pet.). "With regard to fraud and fraudulent inducement claims, the appropriate causation standard depends upon the type of actual damages sought by the plaintiff." *Cunningham v. Blue Cross Blue Shield of Tex.*, No. 2-06-363-CV, 2008 WL 467399, at *8 (Tex. App.—Fort Worth Feb. 21, 2008, pet. denied) (mem. op.); *accord Blue Gordon, C.V. v. Quicksilver Jet Sales, Inc.*, 444 F. App'x 1, 10 (5th Cir. 2011), *cert. denied*, 565 U.S. 1196 (2012). "When general or direct damages are sought, a plaintiff must show that the damages were the necessary and usual result of the defendant's wrongful act, i.e., they flow naturally and necessarily from the wrong." *Cunningham*, 2008 WL 467399, at *8; *accord Blue Gordon, C.V.*, 444 F. App'x at 10. On the other hand, "[w]hen special or consequential damages are sought, the plaintiff must demonstrate that those damages proximately resulted from the fraud alleged." *Cunningham*, 2008 WL 467399, at *8; *accord Hoffman v. L & M Arts*, 838 F.3d 568, 578 (5th Cir. 2016); *Blue Gordon, C.V.*, 444 F. App'x at 10.

Under Texas law, "[t]he components of proximate cause are cause in fact and foreseeability." *Ryder Integrated Logistics, Inc. v. Fayette Cnty.*, 453 S.W.3d 922, 929 (Tex. 2015); *accord Ihnfeldt v. Reagan*, No. 02-14-00220-CV, 2016 WL 7010922, at *13 (Tex. App.—Fort Worth Dec. 1, 2016, pet. denied) (mem. op.); *Bandier Realty Partners, LLC v. SSC Opportunity Partners, LLC*, No. 01-13-00782-CV, 2015 WL 5076282, at *5 (Tex. App.—Houston [1st Dist.] Aug. 27, 2015, no pet.) (mem. op.). "Cause in fact is essentially but-for causation.

In other words, a tortious act is a cause in fact if [it] serves as 'a substantial factor in causing the injury and without which the injury would not have occurred.'" *Ryder Integrated Logistics, Inc.*, 453 S.W.3d at 929 (quoting *Del Lago Partners, Inc. v. Smith*, 307 S.W.3d 762, 774 (Tex. 2010)). Further, to establish foreseeability, a plaintiff must establish "that the injury be of such a general character as might reasonably have been anticipated; and that the injured party should be so situated with relation to the wrongful act that injury to him or to one similarly situated might reasonably have been foreseen." *Id.* (quoting *Nixon v. Mr. Prop. Mgmt. Co.*, 690 S.W.2d 546, 551 (Tex. 1985)).

The Rose Parties do not contend that the Weston Parties failed to establish cause in fact, nor could they.[26]  Rather, the Rose Parties argue that the "'but for' findings are too attenuated to support damages" under Texas law.  The bankruptcy court found that "Weston testified, credibly, that she would not have attended the dispersal sale if she had known about the pre-auction deal between Rose and the Aarons."  Moreover, during trial, when asked if she would have attended the Dispersal Sale if she had known that all of the horses were for sale with reserve, Weston responded:  "Absolutely not."  Furthermore, Weston also confirmed that she would not have "spent one penny at the sale," and reiterated that she "wouldn't have come to the sale."

---

[26] Although the Rose Parties do not explicitly allege that the Weston Parties failed to demonstrate foreseeability, they suggest that the Weston Parties were required to do so under *Ryder Integrated Logistics*.  Nevertheless, the Weston Parties presented sufficient evidence from which it could be inferred that their injuries were a foreseeable result of Rose's misrepresentations.  At trial, Brandly explained that people label an auction as a complete dispersal sale "to heighten attention, heighten participation, bigger crowds, bigger money, better seller position . . . there is absolutely no question that absolute auctions garner bigger crowds, more money, more participation, more of a frenzy if you will, than with reserve auctions."  Moreover, Rose fueled this "frenzy" by directing the Aarons to place fake bids for the horses they already purchased.  In addition to her behavior with the Aarons, Rose, by labeling the auction as a "complete dispersal sale," should have reasonably foreseen that her misrepresentations might cause the type of injury that occurred to Weston.

Weston's reliance on Rose's misrepresentations continued during the Dispersal Sale.  As the bankruptcy court found, "Weston [] witnessed and was influenced by the bidding on SHINER NAMED SIOUX, which appeared to sell for $850,000.00, when, in reality, the Aarons paid only $750,000.00 for the stallion pursuant to the Confidential Term Sheet."  At trial, Weston testified:

> Well, I'm seeing the palomino go through the ring, Lot Number 33, A SHINER NAMED SIOUX sell for $850,000.  Later[,] Lot Number 66 comes through the ring, soral horse, as a full-blood brother and the bidding starts off much lower and hangs at a certain price.  And I'm thinking, wow, I just saw a Ferrari go through the ring for $850,000 and I'm seeing something at $150,000.  I could potentially buy the Ferrari full-blood brother for a used car Chevrolet price.  And I'm thinking – now I've got something to compare it to directly, blood brother to blood brother.  This is a no-brainer kind of decision.  Why not?

Weston later confirmed that had she known the truth about the price or the arrangement regarding A SHINER NAMED SIOUX, she would not have bid on SHINERS LENA DOC.  Weston's testimony supports the bankruptcy court's conclusion that the "representations were important to Weston in making her decision to bid."  Unlike the cases cited by the Rose Parties, the evidence presented at trial shows a direct link between Rose's misrepresentations and Weston's injuries before, during, and after the Dispersal Sale.  Thus, the bankruptcy court did not err, and Rose's challenge to the causation element of the Weston Parties' fraud claims fails.

## B.   The Weston Parties' Damages Award

The Rose Parties next challenge the bankruptcy court's damages award, asserting that it applied an incorrect measure of damages and that there is no evidence to support the award under a correct measure.  The court reviews the bankruptcy court's damages award, a finding of fact, for clear error; however, it reviews the proper measure of damages, a question of law, *de novo*. *Eni US Operating Co., Inc.*, 919 F.3d at 941.

1.     The Weston Parties' Auction Damages

The Rose Parties assert that there is no evidence to support the bankruptcy court's award of $252,035.00 that it characterized as "Auction Damages." Specifically, the Rose Parties argue that, when considering the proper measure of damages, Weston's testimony amounts to no evidence of the fair market value of the horses received at the time of the Dispersal Sale. The Weston Parties, on the other hand, contend that there is ample evidence to support the bankruptcy court's finding that Weston incurred out-of-pocket losses during the auction. In its Memorandum Opinion, the bankruptcy court concluded:

> Weston incurred $288,075.00 in out-of-pocket damages while at the auction in reliance on the representations made by Rose. Weston testified that none of these out-of-pocket amounts would have been spent but for the representations made before and during the auction, including the advertising, the dispersal sale catalog, the admitted false bidding by the Aarons, and other false representations made by Rose's announcers and auctioneers. The Court finds that these constitute direct damages that were the necessary and usual result of Rose's conduct.

At common law, for claims based on fraud[27], a plaintiff may recover actual damages, which are either direct or consequential. *Baylor Univ. v. Sonnichsen*, 221 S.W.3d 632, 636 (Tex. 2007); *Samson Lone Star Ltd. P'ship v. Hooks*, 497 S.W.3d 1, 19 (Tex. App.—Houston [1st Dist.] 2016, pet. denied). Consequential damages are "'those damages which result naturally, but not necessarily,' from the defendant's wrongful acts," whereas direct damages "compensate for the loss that is the necessary and usual result of the act." *Baylor Univ.*, 221 S.W.3d at 636 (quoting

---

[27] In addition to their fraud claims, the Weston Parties prevailed on their TTLA claim. Under the TTLA, a claimant may recover actual damages as well as statutory damages not exceeding $1,000.00. TEX. CIV. PRAC. & REM. CODE § 134.005. Texas courts define actual damages under TTLA as "those recoverable at common law." *Beaumont v. Basham*, 205 S.W.3d 608, 619 (Tex. App.—Waco 2006, pet. denied); *accord Dunn v. Parker*, No. 06-19-00036-CV, 2019 WL 4559096, at *4 (Tex. App.—Texarkana Sept. 20, 2019, no pet.) (mem. op.). Thus, the court applies the same damages analysis to the Weston Parties' TTLA claim as it applied to their fraud claims.

*Henry S. Miller Co. v. Bynum*, 836 S.W.2d 160, 163 (Tex. 1992)); *accord J & D Towing, LLC*, 478 S.W.3d at 655.  "'Texas recognizes two measures of direct damages for common-law fraud:' out-of-pocket and benefit-of-the-bargain." *Baylor Univ.*, 221 S.W.3d at 636 (quoting *Formosa Plastics Corp. USA v. Presidio Eng'rs & Contractors, Inc.*, 960 S.W.2d 41, 49 (Tex. 1998)); *accord Quintel Tech. Ltd. v. Huawei Techs. USA, Inc.*, No. 4:15-CV-00307, 2018 WL 6930270, at *1 (E.D. Tex. Feb. 27, 2018); *Zorrilla v. Aypco Constr. II, LLC*, 469 S.W.3d 143, 153 (Tex. 2015); *Adam v. Marcos*, 620 S.W.3d 488, 508 (Tex. App.—Houston [14th Dist.] 2021, pet. filed).  "Out-of-pocket damages, which derive from a restitutionary theory, measure the difference between the value of that which was parted with and the value of that which was received." *Baylor Univ.*, 221 S.W.3d at 636; *accord Kinsel v. Lindsey*, 526 S.W.3d 411, 421 (Tex. 2017); *Zorrilla* , 469 S.W.3d at 153; *Adam*, 620 S.W.3d at 508.  Importantly, the values "are determined at the time of the sale or transaction induced by the fraud." *Kinsel*, 526 S.W.3d at 421.  "Benefit-of-the-bargain damages, which derive from an expectancy theory, evaluate the difference between the value that was represented and the value actually received." *Zorrilla* , 469 S.W.3d at 153; *Baylor Univ.*, 221 S.W.3d at 636; *Adam*, 620 S.W.3d at 508.

Although the Rose Parties' challenge to Weston's testimony regarding the value of the horses she received may be correct[28], the bankruptcy court did not cite Weston's opinion or, apparently, rely upon it in reaching its conclusions.  Weston testified, and the bankruptcy court

---

[28] At trial, Weston testified that she believed that "SHINERS LENA DOC had a fair market value of zero dollars at the time of the auction" and made the same assertion about the other four horses that she purchased.  Weston did not give the basis of her opinion and gave no further explanation for her values of the horses that she purchased. *See Justiss*, 397 S.W.3d at 159 (holding that, although a property owner may testify as to the value of his or her property, "the testimony must support a verdict, and conclusory or speculative statements do not").

found, that she had spent over $288,000.00 at the Dispersal Sale because of Rose's misrepresentations, and, the bankruptcy court accordingly assessed Rose's "Auction" damages as $288,075.00. Weston, however, sought rescission of her purchase of SHINERS LENA DOC for which the purchase price was $190,000.00. The bankruptcy court granted rescission and noted that "[t]he rescission amount of $190,000.00 is included in the Auction damages." Importantly, the bankruptcy court was not required to account for the "value received[29]" when awarding the Weston Parties' rescission for SHINERS LENA DOC in the amount of $190,000.00. *See SeaQuest Diving, LP v. S&J Diving, Inc. (In re SeaQuest Diving), LP*, 579 F.3d 411, 419 (5th Cir. 2009) ("Rescission is an equitable remedy and, as a general rule, the measure of damage is the return of the consideration paid."); *Italian Cowboy Partners, Ltd. v. Prudential Ins. Co. of Am.*, 341 S.W.3d 323, 345 (Tex. 2011); *Ginn v. NCI Bldg. Sys., Inc.*, 472 S.W.3d 802, 842 (Tex. App.—Houston [1st Dist.] 2015, no pet.).

Along with the rescission award that accounted for $190,000.00 of the "Auction" damages award, the bankruptcy court awarded the Weston Parties $98,075.00, presumably accounting for the amount Weston paid for the remaining four horses. As to the rest of the horses, the bankruptcy court found that Weston sold all of the horses she had purchased at the Dispersal Sale, aside from SHINERS LENA DOC, at a "reputable public auction in San Antonio, Texas," for $36,040.00. Discussing Weston's mitigation efforts, the bankruptcy court concluded:

---

[29] Although it was not required to account for the fair market value of SHINERS LENA DOC at the time of the Dispersal Sale when calculating the Weston Parties' damages, the bankruptcy court concluded that "the fair market value is what the Aarons agreed to pay" for the horses and that the Aarons agreed to pay $150,000.00 for SHINER LENA DOC. Therefore, according to the bankruptcy court, SHINERS LENA DOC's fair market value was $150,000.00 at the time of the Dispersal Sale.

Weston sold all but one of the horses she purchased at Rose's dispersal sale at a reputable sale in San Antonio. Weston has credited those amounts to Rose in her total calculation of damages. The Court finds that there was no evidence suggesting that the San Antonio sale was not a reasonable sale or that such mitigation was not reasonable. The Court further finds, as described above, that the damage calculations above accounted for the reasonable mitigation efforts by the Weston Parties.

The bankruptcy court adjusted the "Post-Auction Damages" by $36,040.00 to account for these mitigation efforts. Accordingly, although not included in its calculation of the "Auction Damages," the bankruptcy court accounted for the actual value of the horses that Weston received at the Dispersal Sale.

In a footnote, the Rose Parties argue that the value that Weston received at the San Antonio auction for the four horses "cannot constitute 'fair market value' for the four horses at the 'time of the sale' . . . because it occurred three years after the 'sale.'" Actual sale price, however, can be evidence of market value, if the sale is not "out of the ordinary in some way." *SPT Fed. Credit Union v. Big H Auto Auction, Inc.*, 761 S.W.2d 800, 801 (Tex. App.—Houston [1st Dist.] 1988, no pet.). Here, the bankruptcy court concluded that the San Antonio auction was a "reputable public auction," and "there was no evidence suggesting that the San Antonio sale was not a reasonable sale." Moreover, there is no indication in the record that the horses' value had diminished during the time between the Dispersal Sale and the San Antonio auction.[30]

Significantly, Rose apparently presented no evidence at trial, and has directed the court to no evidence on appeal, which contravenes the bankruptcy court's valuation of the four horses at the time of the Dispersal Sale. The bankruptcy court's ultimate damages award accounted for the

---

[30] The record reflects that Rose personally cared for the horses at issue between the Dispersal Sale and the San Antonio Auction.

difference between the value of what was paid ($98,000.00 for the four horses other than SHINERS LENA DOC) and the value of what was received ($36,040.00 adjusted for Weston's mitigation).  *See Kinsel*, 526 S.W.3d at 421; *Zorrilla* , 469 S.W.3d at 153; *Baylor Univ.*, 221 S.W.3d at 636; *Adam*, 620 S.W.3d at 508.  Therefore, the court concludes that the bankruptcy court did not commit clear error in it damages findings and award.

### 2.   The Weston Parties' Post-Auction Damages

The Rose Parties contend that the bankruptcy court erred by awarding "Post-Auction" damages because:  Weston did not sustain the alleged damages and Equis Equine does not have a cause of action; no competent evidence supports the damages; and the damages were not proximately caused by Rose's alleged misrepresentations.  Weston argues that she is entitled to the "Post-Auction" damages because she incurred the obligation to pay the expenses, that she is entitled to expenses incurred after the auction, and that Rose's misrepresentations were a but-for cause of her "Post-Auction" expenses.   The bankruptcy court awarded the Weston Parties $181,325.18 in "Post-Auction" damages.

The Rose Parties first argue that "Weston and Equis Equine lack a legal right to recover post-auction damages because neither suffered both 'a personal cause of action and personal injury.'"  The Rose Parties, however, miss the mark.  Characterizing the issue as one of standing, the bankruptcy court reasoned that "Rose sent monthly bills to Weston, not Equis Equine, and Weston has standing to seek damages."

The United States Court of Appeals for the Fifth Circuit has held that "the existence of a potential third-party payor . . . does not deprive the [plaintiffs] of standing that would otherwise exist as a result of incurring that obligation."  *Rideau v. Keller Indep. Sch. Dist.*, 819 F.3d 155,

161 (5th Cir. 2016).  In *Rideau*, Breggett and Terrence Rideau (collectively, the "Rideaus"), the parents of son T.R., sued their son's school district alleging that he had been abused by his teacher.  *Id.* at 158.  T.R. suffered from encephalopathy that was induced by a tainted vaccine he received as an infant.  *Id.*  Prior to the lawsuit, the Rideaus created a guardianship management trust for the benefit of T.R., which was funded by the settlement proceeds of a lawsuit related to the tainted vaccine.  *Id.* at 159.  In the lawsuit, the district court dismissed the Rideaus' claims for lack of jurisdiction, finding that only the trust had standing to recover T.R.'s medical expenses and caregiver costs "because it had paid those expenses and was obligated to continue doing so." *Id.* at 160.  In reversing the district court, the Fifth Circuit noted that "the medical bills included in the record are addressed to Breggett Rideau as the obligated party."  *Id.* at 161.  Accordingly, applying Texas law, the court concluded that the Rideaus, on behalf of T.R., could recover medical expenses they incurred even if the expenses were ultimately paid for by an insurer, trust, or even a wealthy relative.  *Id*. at 162.

Similar to *Rideau*, the bills for Rose's "Post-Auction" services were directed to Weston, not Equis Equine.  Thus, Weston incurred an obligation to pay the expenses for the horses and was injured accordingly.  Surely, if the shoe were on the other foot and Weston refused to pay for the horses' care, boarding, and expenses, Weston, to whom the bills were directed, would be liable to Rose.  Nevertheless, because Weston incurred the obligation to pay for the horses' care, boarding, and expenses, she was injured and can recover damages caused by Rose's misrepresentations.  The bankruptcy court did not err in reaching this conclusion.

The Rose Parties next argue that there is no evidence that the "Post-Auction" damages were incurred because of the auction.  The Weston Parties contend that although the damages

constitute a proper award of direct damages, they were entitled to recover both consequential and direct damages resulting from Rose's actions. The bankruptcy court concluded that the Weston Parties' "Post-Auction" damages "constitute direct damages that were the necessary and usual result of Rose's conduct." Because the bankruptcy court characterized the "Post-Auction" damages as direct, the court will analyze them as such.

As previously discussed, direct damages "compensate for the loss that is the necessary and usual result of the act." *Baylor Univ.*, 221 S.W.3d at 636; *accord J & D Towing, LLC*, 478 S.W.3d at 655. Weston testified at trial that shortly after the Dispersal Sale, she spoke with Rose, who assured her that she would "serve as mare manager, stallion manager, manager of [Weston's] horses." Accordingly, the bankruptcy court concluded:

> After the auction, Rose sent Weston monthly invoices for the care, boarding, and expenses associated with the horses Weston had purchased at the dispersal sale. The total amount of the invoices was $181,325.18 from the date of the dispersal sale until the horses (with the exception of SHINERS LENA DOC) were sold at an auction in San Antonio.

The Rose Parties do not refute these findings. Regardless of where Weston boarded her horses and in whose care she placed them, after her purchase of the horses at the Dispersal Sale, which was caused by Rose's misrepresentations, Weston necessarily had to expend money on the horses' care and board. Moreover, it was foreseeable to Rose that her misrepresentations, designed to induce a buyer like Weston to bid on her horses, would result in the buyer's having to expend resources to care for the horses after the auction.[31] Thus, it appears that the "Post-Auction" damages for the care, boarding, and expenses for the horses that Weston purchased at the

---

[31] As previously discussed, an award of direct damages does not require foreseeability. *See Cunningham*, 2008 WL 467399, at *8; *accord Blue Gordon, C.V.*, 444 F. App'x at 10.

Dispersal Sale were "a necessary and usual result" of Rose's misrepresentations that caused Weston to purchase the horses in the first place.  Furthermore, direct damages do not necessarily have to be incurred at the time of the tortious act in order to be recoverable.  *See, e.g., Cherokee Cnty. Cogeneration Partners, L.P. v. Dynegy Mktg. & Trade*, 305 S.W.3d 309, 314 (Tex. App.—Houston [14th Dist.] 2009, no pet.) (holding resale profits lost after breach were direct damages).

The Rose Parties also contend that there is no evidence that the "Post-Auction" damages were caused by the alleged misrepresentations.  The Rose Parties claim that Rose's "alleged misrepresentation did not cause the alleged damages; Weston always would have incurred those amounts, even if the alleged misrepresentations did not occur."  The Rose Parties overlook the bankruptcy court's unchallenged conclusions.

The bankruptcy court found:

> Weston actually and justifiably relied on Rose's material and false representations concerning the nature of the auction in the dispersal sale catalog as well as the material misrepresentations during the auction, including the false bidding by the Aarons and false representations by the announcers and auctioneers. Weston's bids on the horses she purchased at the auction were influenced [by] Rose's material omissions as well as her material and false representations, and, therefore, the omissions and misrepresentations caused injury to Weston.

In other words, Weston would not have bid on the horses had it not been for Rose's misrepresentations.  If she had not purchased the horses at the auction, she would not have had to pay for their upkeep.  Moreover, as mentioned above, it was foreseeable to Rose that a person who bid on her horses because of her misrepresentations would necessarily have to spend money on their care if the bidder prevailed at the auction.  The bankruptcy court did not commit error in determining that Rose's misrepresentations caused Weston's "Post-Auction" injuries.

3.   The Weston Parties' Pre-Auction Damages

The Rose Parties spend a paragraph objecting to the bankruptcy court's award of "Pre-Auction" damages.[32]   Specifically, the Rose Parties contend that "Weston's causation theory is far too attenuated.  Rose's conduct did not cause Weston to hire Froeschl or cause them to eat." The bankruptcy court concluded:

> Weston testified and produced additional evidence that she incurred $4,557.94 in out-of-pocket damages prior to attending the auction in reliance on the representations made by Rose.  But for Rose's representations about the nature of the dispersal sale, none of these expenditures would have been made.  The Court finds that these constitute direct out-of-pocket damages that were the necessary and usual result of the Rose Parties' conduct as described herein.

The bankruptcy court reasoned that Rose's various misrepresentations, such as that the Dispersal Sale was a "complete dispersal sale," were designed to induce behavior such as Weston's, that is, attendance at the Dispersal Sale.  Indeed, as the bankruptcy court noted, "Weston testified, credibly, that she would not have attended the dispersal sale if she had known about the pre-auction deal between Rose and the Aarons."  Additionally, as Brandly testified, the purpose of Rose's misrepresentations was "to heighten attention, heighten participation[;] bigger crowds, bigger money, [and] better seller position."   Thus, not only were Rose's misrepresentations a but-for cause of Weston's "Pre-Auction" injuries, it was foreseeable to Rose that she would induce individuals to attend the Dispersal Sale, thereby spending money for lodging and travel expenses, by representing the event to be a "complete dispersal sale."  Accordingly,

---

[32] Rose asserts that "[l]ike the post-auction damages, it is undisputed [the pre-auction damages] were not incurred at the time of the sale."  As previously discussed, this does not serve as a bar to recovery.

the bankruptcy court did not err in awarding the Weston Parties $4,557.94 in "Pre-Auction" damages.

C.    <u>Award of Rescission Damages</u>

In their final issue, the Rose Parties challenge the bankruptcy's court rescission damages award for SHINERS LENA DOC, arguing that rescission is not an available remedy under section 2.328(d) of the Texas Business and Commerce Code and, further, that rescission is not available because there is no evidence of fraud or actual damages.  The Weston parties challenge these assertions.  The availability of rescission is reviewed *de novo*.  *Perez v. Bruister*, 823 F.3d 250, 265 (5th Cir. 2016).

In its Memorandum Opinion, the bankruptcy court awarded Weston rescission of the sale of SHINERS LENA DOC after concluding that "Rose and her agents engaged in 'puffing,' which triggered [Section 2.328 of the Texas Business and Commerce Code]."  Section 2.328(d) states in relevant part:

> If the auctioneer knowingly receives a bid on the seller's behalf or the seller makes or procures such a bid, and notice has not been given that liberty for such bidding is reserved, the buyer may at his option avoid the sale . . . .

TEX. BUS. & COM. CODE § 2.328(d).  The Rose Parties argue that this provision is not applicable because "as a matter of law, Rose gave 'notice' that bidding would be 'reserved.'"  As previously discussed at length, the bankruptcy court's finding that Rose explicitly misrepresented the auction as a "complete dispersal sale" conducted "without reserve" is not erroneous and is supported by ample evidence.  Thus, the Rose Parties' argument is without merit, and the bankruptcy court did not err in applying section 2.328(d) of the Texas Business and Commerce Code.

Similarly, the Rose Parties' argument that rescission was not an available remedy for common law fraud is without merit. "Rescission is an equitable remedy that operates to extinguish a contract that is legally valid but must be set aside due to fraud, mistake, or for some other reason to avoid unjust enrichment." *Ginn*, 472 S.W.3d at 837 (quoting *Gentry v. Squires Const., Inc.*, 188 S.W.3d 396, 410 (Tex. App.—Dallas 2006, no pet.)); *accord Munguia v. Pennymac Loan Servs., LLC*, No. 7:20-CV-00070, 2020 WL 4934593, at *3 (S.D. Tex. Aug. 24, 2020); *Bombardier Aero. Corp. v. SPEP Aircraft Holdings, LLC*, 572 S.W.3d 213, 232 (Tex. 2019). Rescission damages are available for common law fraud claims. *Ginn*, 472 S.W.3d at 837; *Fazio v. Cypress/GR Hous. I, L.P.*, 403 S.W.3d 390, 396 (Tex. App.—Houston [1st Dist.] 2013, pet. denied) Further, "a rescission award requires a showing of actual damages." *Cruz v. Andrews Restoration, Inc.*, 364 S.W.3d 817, 823 (Tex. 2012). The Rose Parties contend that Rose did not commit fraud and Weston did not sustain actual damages to warrant rescission of the sale. Again, as previously discussed, the bankruptcy court's conclusion that Rose made numerous fraudulent representations and omissions is substantiated by evidence in the record. Further, there is also ample evidence supporting the bankruptcy court's conclusion that the Weston Parties, and particularly Weston herself, suffered actual damages. Accordingly, the bankruptcy court did not err in awarding Weston rescission of the sale of SHINERS LENA DOC. Therefore, the Rose Parties' third issue is without merit.

V.    The Weston Parties' Appeal of Adversary Case No. 17-04131

The Weston Parties appeal certain rulings from the bankruptcy court's judgment. In their appeal, the Weston Parties complain that the bankruptcy court erred by holding that they did not establish their claims for conspiracy and aiding and abetting against the Rose Parties; abused its

53

discretion by declining to grant equitable subordination of the Aaron Parties' claims to the Weston Parties' claims pursuant to 11 U.S.C. § 510(c); and abused its discretion by not awarding exemplary damages to the Weston Parties.

A.     Weston's Civil Conspiracy and Aiding and Abetting Claims

In their first issue, the Weston Parties argue that the bankruptcy court erred in concluding that they had not established claims for civil conspiracy or aiding and abetting.[33]  The Weston Parties contend that the record and the bankruptcy court's findings establish all the elements necessary for these claims.[34]   The Aaron Parties and the Rose Parties assert that the record supports the bankruptcy court's conclusions.   The bankruptcy court stated:

> Even assuming Weston established a tortious act by the Aarons, Stevens, and the auctioneers, the Court concludes that Weston has not established that Rose had a specific intent or agreement to assist them or, specifically, to assist the Aarons in a conspiracy to defraud Weston and the other auction attendees.   The preponderance of the credible evidence establishes that Rose and the Aarons did not have any common purpose and that Rose did not knowingly assist the Aarons in a

---

[33] On appeal, the Weston Parties assert that the underlying torts supporting their civil conspiracy claims are their claims against the Rose Parties for fraud and TTLA violations, in which, as previously discussed, they were successful.  The damages for civil conspiracy "come from the underlying wrongful act, not the conspiracy itself."  *Agar Corp., Inc. v. Electro Cirs. Int'l, LLC*, 580 S.W.3d 136, 142 (Tex. 2019).  Accordingly, the Weston Parties' challenge to the bankruptcy court's conspiracy-related findings will not affect their recovery.  Thus, it appears that the Weston Parties' cross-appeal on this issue has nothing to do with the Rose Parties and everything to do with the Weston Parties' planned future litigation against third parties, including the Aarons, in which they may intend to use these findings offensively.

[34] Although the Weston Parties claim that they should have prevailed on their aiding and abetting claims, they do not explain their position.  Moreover, neither the Texas Legislature nor the Texas Supreme Court has recognized an aiding and abetting claim in civil lawsuits.  *In re DePuy Orthopaedics, Inc., Pinnacle Hip Implant Prod. Liab. Litig.*, 888 F.3d 753, 781 (5th Cir. 2018); *First United Pentecostal Church of Beaumont v. Parker*, 514 S.W.3d 214, 224 (Tex. 2017); *Hampton v. Equity Tr. Co.*, 607 S.W.3d 1, 4 (Tex. App.—Austin 2020, pet. filed) (citing *Juhl v. Airington*, 936 S.W.2d 640, 643 (Tex. 1996)).  The court declines to recognize such a claim without guidance from Texas courts.  *See In re DePuy Orthopaedics, Inc.*, 888 F.3d at 781 ("When sitting in diversity, a federal court exceeds the bounds of its legitimacy in fashioning novel causes of action not yet recognized by the state courts.").  Thus, the bankruptcy court did not err by declining to recognize the Weston Parties' aiding and abetting claim.

tortious act.  The Court, therefore, concludes that Weston has failed to establish a claim against the Rose Parties for conspiracy or aiding and abetting.

"In Texas, a civil conspiracy is a combination 'to accomplish an unlawful purpose or to accomplish a lawful purpose by unlawful means.'" *Arthur W. Tifford, PA v. Tandem Energy Corp.*, 562 F.3d 699, 709 (5th Cir. 2009) (quoting *Lane v. Halliburton*, 529 F.3d 548, 564 (5th Cir. 2008)); *accord Murray v. Earle*, 405 F.3d 278, 293 (5th Cir.), *cert. denied*, 546 U.S. 1033 (2005); *In re Enron Corp. Sec., Derivative & ERISA Litig.*, 623 F. Supp. 2d 798, 808 (S.D. Tex. 2009); *Pilepro, LLC v. Chang*, 152 F. Supp. 3d 659, 678 (W.D. Tex. 2016), *aff'd sub nom. PilePro, L.L.C. v. Heindl*, 676 F. App'x 341 (5th Cir. 2017); *Ernst & Young, L.L.P.*, 51 S.W.3d at 583.  Under Texas law, the elements of a civil conspiracy claim are:  "(1) two or more persons; (2) an object to be accomplished; (3) a meeting of minds on the object or course of action; (4) one or more unlawful, overt acts; and (5) damages as the proximate result."[35]  *D'Onofrio*, 888 F.3d at 214-15 (quoting *Massey v. Armco Steel Co.*, 652 S.W.2d 932, 934 (Tex. 1983)); *accord WickFire, L.L.C. v. Woodruff*, 989 F.3d 343, 358 (5th Cir. 2021); *Parker*, 514 S.W.3d at 222; *In re Est. of Poe*, 591 S.W.3d 607, 645 (Tex. App.—El Paso 2019, pet. filed).

1.    Overt Act

The Weston Parties first argue that the bankruptcy court erred by requiring them to establish an overt act by each member of the conspiracy.  As part of their civil conspiracy claim, the Weston Parties were required to prove that one or more unlawful, overt acts were taken in pursuance of the unlawful objective.  *WickFire, L.L.C.*, 989 F.3d at 358; *Parker*, 514 S.W.3d at

---

[35] The bankruptcy court did not address the element of damages.  The court will not address the issue of damages because the court concludes that the bankruptcy court did not err in finding that the Weston Parties failed to establish the other elements of civil conspiracy.

222.   The Weston Parties are correct that "[t]he actions of one member in a conspiracy might support a finding of liability as to all of the members." *Parker*, 514 S.W.3d at 224.  The Weston Parties, however, mischaracterize the bankruptcy court's conclusions.  The bankruptcy court did not require that all parties commit an overt act; it merely required evidence that the Aarons, Stevens, the auctioneers, or some other third party committed an underlying tort in which Rose conspired.

Under Texas law, "civil conspiracy is a theory of vicarious liability and not an independent tort." *Tummel v. Milane*, 787 F. App'x 226, 227 (5th Cir. 2019) (quoting *Agar Corp., Inc.*, 580 S.W.3d at 142).  The Texas Supreme Court has "repeatedly called civil conspiracy a 'derivative tort,' meaning it depends on some underlying tort or other illegal act." *Agar Corp., Inc.*, 580 S.W.3d at 140-41; *accord WickFire, L.L.C.*, 989 F.3d at 358; *Tummel*, 787 F. App'x at 227.  The "use of the word 'derivative' in this context means a civil conspiracy claim is connected to the underlying tort and survives or fails alongside it." *Agar Corp., Inc.*, 580 S.W.3d at 141; *accord WickFire, L.L.C.*, 989 F.3d at 358; *Midwestern Cattle Mktg., L.L.C. v. Legend Bank, N. A.*, 800 F. App'x 239, 248 (5th Cir. 2020).  Thus, a "civil conspiracy requires some underlying wrong." *Agar Corp., Inc.*, 580 S.W.3d at 141.

In the parties' Joint Pretrial Order, Weston asserted claims against Rose, individually, for conspiracy and aiding and abetting.[36]  Specifically, Weston claimed "that Rose should be jointly and severally liable for the actions and torts committed by her co-conspirators, the Aarons, Mr. Stevens, and the Auctioneers."  Weston, however, did not assert any claims against the Aarons, Stevens, or the auctioneers in the adversary proceeding.  Instead, according to the bankruptcy court, Weston's claims against these third parties "shall be adjudicated in subsequent proceedings."  Thus, the Weston Parties, by their own pleading, were required to show that the Aarons, Stevens, the auctioneers, or another third party committed "some underlying tort" for which Rose can be held jointly and severally liable.  *See Agar Corp., Inc.*, 580 S.W.3d at 140-41; *accord WickFire, L.L.C.*, 989 F.3d at 358; *Tummel*, 787 F. App'x at 227.  This is exactly what the bankruptcy court required of the Weston Parties.

The bankruptcy court made no findings that the Aarons, Stevens, the auctioneers, or another third party committed a tort against the Weston Parties.  On appeal, the Weston Parties present several findings by the bankruptcy court that they claim represent overt acts committed "in furtherance of the conspiracy."  Each of the findings that the Weston Parties reference, however, does not demonstrate the underlying tort necessary to support a civil conspiracy claim.  Interestingly, in their briefing, the Weston Parties do not even assert that the alleged civil

---

[36] In the Fifth Circuit, "[i]t is a well-settled rule that a joint pretrial order signed by both parties supersedes all pleadings and governs the issues and evidence to be presented at trial." *Excel Modular Scaffold & Leasing Co. v. Occupational Safety & Health Rev. Comm'n*, 943 F.3d 748, 755 (5th Cir. 2019) (quoting *Elvis Presley Enters., Inc. v. Capece*, 141 F.3d 188, 206 (5th Cir. 1998)), *cert. denied*, 141 S. Ct. 264 (2020).  Therefore, "if a claim or issue is omitted from the order, it is waived, even if it appeared in the complaint." *Capece*, 141 F.3d at 206; *accord Seibert v. Jackson Cnty.*, 851 F.3d 430, 439 (5th Cir. 2017); *Innovation Scis., LLC v. Amazon.com, Inc.*, No. 4:18-CV-474, 2021 WL 765089, at *2 (E.D. Tex. Feb. 26, 2021).  Thus, the Weston Parties waived any claim not asserted in the parties' Joint Pretrial Order.

conspiracy is based on a tort committed by the Aarons, Stevens, the auctioneers, or another third party.

Nevertheless, the Weston Parties cannot now alter their pleadings and seek to hold Rose liable for an alleged civil conspiracy that relates to Rose's own underlying tort.  The Weston Parties did not assert this theory in the parties' Joint Pretrial Order, and, accordingly, it is waived. *See Seibert*, 851 F.3d at 439; *Capece*, 141 F.3d at 206; *Innovation Scis., LLC*, 2021 WL 765089, at *2.  Moreover, civil conspiracy is "a theory of vicarious liability." *Tummel*, 787 F. App'x at 227.  Thus, it provides a plaintiff with grounds for recovery "against co-conspirators who did not commit the underlying unlawful act." *Agar Corp., Inc.*, 580 S.W.3d at 141; *see also Midwestern Cattle Mktg., L.L.C.*, 800 F. App'x at 248 ("In Texas, civil conspiracy is a theory of liability that allows an injured party to recover from a tortfeasor's coconspirators.").  Accordingly, under Texas law, a defendant cannot be separately liable for civil conspiracy and also be personally liable for the underlying tort.  Thus, even if the Weston Parties had properly asserted such a theory to the bankruptcy court, there is no cognizable cause of action against Rose for civil conspiracy arising solely from her own tort.

### 2.    Specific Intent

The Weston Parties next challenge the bankruptcy court's conclusion that the Rose Parties lacked the specific intent necessary for civil conspiracy.  According to the Texas Supreme Court, "civil conspiracy requires specific intent to agree to accomplish something unlawful or to accomplish something lawful by unlawful means." *Parker*, 514 S.W.3d at 222; *accord Lahman v. Cape Fox Corp.*, No. 4:17-CV-305, 2020 WL 1974249, at *15 (E.D. Tex. Apr. 24, 2020); *Straehla v. AL Glob. Servs., LLC*, 619 S.W.3d 795, 811 (Tex. App.—San Antonio 2020, pet.

denied).  Further, the conspirators must be "aware of the intended harm or proposed wrongful conduct at the outset of the combination or agreement."  *Parker*, 514 S.W.3d at 222; *accord Rodriguez-Meza v. Venegas*, No. DR-17-CV-54-AM/CW, 2018 WL 7348864, at *15 (W.D. Tex. Sept. 27, 2018); *MVS Int'l Corp. v. Int'l Advert. Sols., LLC*, 545 S.W.3d 180, 196 (Tex. App.—El Paso 2017, no pet.).  Although the Weston Parties reference various findings by the bankruptcy court demonstrating that Rose intended to engage in the tortious activities underlying the Weston Parties' successful fraud claims, they have not cited any findings or evidence demonstrating Rose's specific intent to agree with the Aarons, Stevens, the auctioneers, or another third party to accomplish something unlawful or to accomplish something lawful by unlawful means.  Accordingly, the bankruptcy court did not err in its conclusion that the Rose Parties lacked the specific intent necessary for civil conspiracy.

### 3.   Common Purpose

The Weston Parties also argue that the bankruptcy court's "holding that the Rose Parties did not have a common purpose with the Aarons is also against the overwhelming weight of the evidence."  It appears, as both parties assert, that the bankruptcy court's common purpose conclusion goes to the meeting-of-the-minds requirement.

Courts have interpreted the "meeting of the minds" element as requiring an understanding between the coconspirators "to accomplish an unlawful purpose or to accomplish a lawful purpose by unlawful means."  *In re Enron Corp.*, 623 F. Supp. 2d at 809 (quoting *Transp. Ins. Co. v. Faircloth*, 898 S.W.2d 269, 278 (Tex. 1995)); *accord McGee v. Curry*, No. CV H-09-3470, 2011 WL 13262005, at *9 (S.D. Tex. Feb. 25, 2011); *Shunta v. Westergren*, No. 01-08-00715-CV, 2010 WL 2307083, at *8 (Tex. App.—Houston [1st Dist.] June 10, 2010, no pet.) (mem. op.).

Accordingly, "there must be a preconceived plan and unity of design and purpose, for the common design is of the essence of the conspiracy." *Angel v. La Joya Indep. Sch. Dist.*, 717 F. App'x 372, 379-80 (5th Cir. 2017)*; accord Va. Oak Venture, LLC v. Fought*, 448 S.W.3d 179, 196 (Tex. App.—Texarkana 2014, no pet.); *Goldstein v. Mortenson*, 113 S.W.3d 769, 779 (Tex. App.—Austin 2003, no pet.). Moreover, "[f]or a civil conspiracy to arise, the parties must be aware of the harm or the wrongful conduct at the beginning of the combination or agreement. . . . One cannot agree, expressly or tacitly, to commit a wrong about which he has no knowledge." *Firestone Steel Prod. Co. v. Barajas*, 927 S.W.2d 608, 614 (Tex. 1996); *accord Hopkins & Raines, Inc. v. Lakeland Motors*, No. 5:14-CV-110-CMC, 2016 WL 8605459, at *9 (E.D. Tex. July 18, 2016); *Parker*, 514 S.W.3d at 222; *MVS Int'l Corp.*, 545 S.W.3d at 196. Further, "merely proving a joint 'intent to engage in the conduct that resulted in the injury' is not sufficient to establish a cause of action for civil conspiracy." *Tri v. J.T.T.*, 162 S.W.3d 552, 557 (Tex. 2005) (quoting *Juhl*, 936 S.W.2d at 644); *see Adams v. Alcolac, Inc.*, 974 F.3d 540, 545 (5th Cir. 2020); *Garcia v. Cmtys. in Sch. of Brazoria Cnty., Inc.*, No. CV H-18-4558, 2019 WL 2420079, at *11 (S.D. Tex. June 10, 2019).

It appears from the record that Weston did not elicit evidence at trial demonstrating that Rose and either the Aarons, Stevens, the auctioneers, or another third party entered into an agreement to accomplish an unlawful purpose or to accomplish a lawful purpose by unlawful means. *See McGee*, 2011 WL 13262005, at *9; *In re Enron Corp.*, 623 F. Supp. 2d at 809; *Shunta*, 2010 WL 2307083, at *8. Instead, on appeal, the Weston Parties highlight various factual findings by the bankruptcy court showing that the Aarons and Rose entered into an agreement. The factual findings, however, do not suggest that the agreement between Rose and the Aarons

was to accomplish an unlawful purpose or to accomplish a lawful purpose by unlawful means. The Weston Parties were required to establish more than the Aarons' presence and participation in the Auction or that they had a separate agreement to purchase some of the horses. They did not do so.

The bankruptcy court found that "the Aarons had no personal experience breeding or showing performance quarter horses." Stevens, who claimed to be an expert in equine law, unlike the Aarons' lawyer, assured the Aarons that the "pre-auction purchase agreement with Rose was legal, ethical, and common in the horse industry." Stevens made the same assurances to the Aarons regarding the confidentiality of the agreement. The Weston Parties do not challenge these findings by the bankruptcy court. The Aarons' inexperience with the industry and Stevens's repeated assurances that the agreement was "legal, ethical, and common in the horse industry" support the bankruptcy court's implicit conclusion that Rose and the Aarons did not agree to accomplish an unlawful purpose or to accomplish a lawful purpose by unlawful means.

The Weston Parties' civil conspiracy claim related to the auctioneers fails for a similar reason. The factual findings the Weston Parties reference merely indicate that the auctioneers were aware of Rose's agreement with the Aarons, that they agreed to conduct the auction, that they did not disclose the Aarons' agreement to the public, that they engaged in puffing, and that they made material misrepresentations during the auction. The factual findings do not show that the auctioneers and Rose agreed to defraud the bidders. Certainly, the bankruptcy court could have inferred that Rose and the auctioneers had such an agreement, but a contrary conclusion was permissible. "Where there are two permissible views of the evidence, the factfinder's choice between them cannot be clearly erroneous." *Anderson*, 470 U.S. at 574; *Porretto v. Williams (In*

61

*re Porretto)*, 761 F. App'x 437, 444 (5th Cir. 2019); *Viegelahn v. Lopez (In re Lopez)*, 897 F.3d 663, 672 (5th Cir. 2018). Thus, it was permissible for the bankruptcy court to conclude that Rose and the auctioneers did not have an agreement to defraud the participants in the Dispersal Sale.

The bankruptcy court's findings related to Stevens also do not mandate a contrary conclusion. The bankruptcy court found that Stevens drafted the Confidential Term Sheet and assured the Aarons that it was legal, ethical, and common; that he reviewed the Sale Catalog that contained false and misleading statements; and that he assisted the Aarons during the Dispersal Sale. Again, the bankruptcy court's factual findings do not mandate a conclusion that Stevens and Rose agreed to defraud the bidders, although such a conclusion would be permissible. At most, the bankruptcy court's findings demonstrate "a joint intent to engage in the conduct that resulted in the injury," which is insufficient to support a claim of civil conspiracy. *Tri*, 162 S.W.3d at 557. Therefore, the bankruptcy court did not commit error in concluding that the Weston Parties failed to establish the elements required for a civil conspiracy.

B.    Equitable Subordination

In their second issue, the Weston Parties argue that the bankruptcy court abused its discretion by failing to accord equitable subordination of the Aaron Parties' claims to their own claims. Importantly, the Weston Parties have not directed the court's attention to any appellate decisions in the Fifth Circuit reversing the decision of a bankruptcy court for failure to grant equitable subordination of a claim. After discussing the requirements for a finding of inequitable conduct, the bankruptcy court concluded that "in light of this Court's findings discussed in the conspiracy count against Rose, the Court concludes that Weston has failed to establish grounds

to equitably subordinate the Aaron Parties' allowed claim to her claim." The Aaron Parties claim

that the Weston Parties have "failed to meet the high burden for reversing this decision."

Under 11 U.S.C. § 510, "the court may . . . under principles of equitable subordination,

subordinate for purposes of distribution all or part of an allowed claim to all or part of another

allowed claim" in bankruptcy.  11 U.S.C. § 510(c); *Life Partners Creditors' Trust v. Cowley (In*

*re Life Partners Holdings, Inc.)*, 926 F.3d 103, 122 (5th Cir. 2019).  "In the Fifth Circuit,

equitable subordination is appropriate when (1) the claimant engaged in inequitable conduct; (2)

the misconduct resulted in harm to the debtor's other creditors or conferred an unfair advantage

on the claimant; and (3) equitable subordination is not inconsistent with the Bankruptcy Code."

*In re Life Partners Holdings, Inc.*, 926 F.3d at 122; *Wooley v. Faulkner (In re SI Restructuring,*

*Inc.)*, 532 F.3d 355, 360 (5th Cir. 2008); *Benjamin v. Diamond (In re Mobile Steel Co.)*, 563 F.2d

692, 699 (5th Cir. 1977).  Typically, equitable subordination applies only "(1) when a fiduciary

of the debtor misuses the relationship to the disadvantage of other creditors; (2) when a third party

controls the debtor to the disadvantage of other creditors; and (3) when a third party *actually*

*defrauds* other creditors."  *In re Life Partners Holdings, Inc.*, 926 F.3d at 122 (citing *Official*

*Comm. of Unsecured Creditors v. Cajun Elec. Power Co-op, Inc. (In re Cajun Elec. Power*

*Co-op., Inc.)*, 119 F.3d 349, 357 (5th Cir. 1997)).  The Weston Parties do not claim that the

Aaron Parties are fiduciaries or that they exercised control of the Rose Parties, nor are such

findings supported by the record.

> It is difficult to define the boundaries of inequitable conduct under the first part of
> the three-prong *Mobile Steel* test, but there have been recognized generally three
> categories of misconduct which may constitute inequitable conduct:  (1) fraud,
> illegality, and breach of fiduciary duties; (2) undercapitalization; or (3) claimant's
> use of the debtor as a mere instrumentality or alter ego.

*Fabricators, Inc. v. Tech. Fabricators, Inc. (In re Fabricators, Inc.)*, 926 F.2d 1458, 1467 (5th Cir. 1991); *Life Partners Creditors' Tr. v. Black Diamond Lifeplan Fund*, No. 4:17-CV-00225-O, 2018 WL 4076491, at *4 (N.D. Tex. June 22, 2018). The inequitable conduct may "arise out of any unfair act on the part of the creditor, which affects the bankruptcy results to other creditors and so makes it inequitable that he should assert a parity with them in the distribution of the estate." *In re Fabricators, Inc.*, 926 F.2d at 1467 (quoting *In re Mobile Steel Co.*, 563 F.2d at 70); *Life Partners Creditors' Tr.*, 2018 WL 4076491, at *4. "The fundamental question is whether the creditor's actions 'essentially replaced [the] decision-making capacity' of the debtor." *Life Partners Creditors' Tr.*, 2018 WL 4076491, at *4 (quoting *Smith v. Assocs. Com. Corp. (In re Clark Pipe & Supply Co.), Inc.*, 893 F.2d 693, 701 (5th Cir. 1990)); *U.S. Abatement Corp. v. Mobil Expl. & Producing U.S., Inc. (In re U.S. Abatement Corp.)*, 157 B.R. 590, 591 (E.D. La. 1993), *aff'd sub nom. In re U.S. Abatement Corp.*, 39 F.3d 556 (5th Cir. 1994).

As discussed above, the Aarons were informed that their arrangement with Rose was "legal, ethical, and common in the horse industry," and they had no independent basis to believe otherwise.[37] The factual findings that Weston references demonstrate that Rose used the Aarons and her agreement with them to perpetrate a fraud on the Dispersal Sale's participants; they do not suggest, however, that the Aarons were aware of the scheme or actively and knowingly

---

[37] The Weston Parties offered testimony by the Aarons they claim suggests that the Aarons knew their conduct was inequitable. The bankruptcy court found that "[a]t trial, the Aarons testified that they *now believe* that the agreement with Rose . . . was designed specifically to give a false appearance of competitive bidding and artificially inflate the auction horse values as well as deceive the public, the horse industry, and other auction attendees." This finding is supported by Lori's testimony at trial that she "didn't know it at the time, but that the confidential term sheet gave the auction a false appearance of . . . competitive bidding." Thus, the Aarons' knowledge at the time of trial that Rose's behavior was inequitable does not equate to their awareness of such at the time of the Dispersal Sale.

participated in it.  Thus, the evidence suggests that the Aarons were unknowing participants in Rose's fraudulent schemes.  Indeed, the bankruptcy court concluded:

> The Aarons did not benefit from Rose's demand for confidentiality with respect to their pre-auction purchase agreement for the Blue List Horses or from Rose's use of reserves for the balance of the horses offered at the auction.  The Aarons were bidding dollar-for-dollar with other auction attendees on the non-Blue List Horses, and, with respect to the Red List Horses, they were as vulnerable as everyone else to any price distortions caused by Rose's use of reserves and her requirement that the Aarons "win" the Blue List Horses.

Given the evidence elicited at trial and the bankruptcy court's factual findings, the bankruptcy court did not abuse its discretion in finding that the Aarons did not engage in inequitable conduct.

The bankruptcy court's conclusion with regard to equitable subordination appears to be based solely on the lack of viability of the first element, that the Aarons engaged in inequitable conduct.  Because the court finds that the bankruptcy court did not commit error in reaching this conclusion, the court will not address the remaining two elements.  Accordingly, the bankruptcy court did not err in refusing to afford equitable subordination of the Aaron Parties' claims to the Weston Parties' claims.

### C.   Exemplary Damages

In their final issue, the Weston Parties contend that the bankruptcy court abused its discretion by failing to award them exemplary damages against the Rose Parties.  The Rose Parties argue that the Weston Parties' challenge to the bankruptcy court's exemplary damages ruling is "meritless."  The bankruptcy court concluded:

> [U]nder the clear and convincing evidence standard, the Court concludes that exemplary damages are not warranted.  Rose's misconduct has exposed her to liability, but she did not act maliciously or engage in the sort of extreme misconduct, over and above her fraud and violations of the TTLA, that would support exemplary damages.

"Exemplary damages 'are proper only in the most exceptional cases.'" *Eagle Oil & Gas Co. v. Shale Expl., LLC*, 549 S.W.3d 256, 283–84 (Tex. App.—Houston [1st Dist.] 2018, pet. dism'd) (quoting *Transp. Ins. Co. v. Moriel*, 879 S.W.2d 10, 18 (Tex. 1994)); *accord Rooters v. State Farm Lloyds*, 428 F. App'x 441, 448 (5th Cir. 2011), *cert. denied*, 565 U.S. 1114 (2012); *Kuss v. Ulmer*, No. SA-19-CV-629-JKP, 2021 WL 1433062, at *3 (W.D. Tex. Mar. 17, 2021). "Under Texas law, with exceptions not relevant here, 'exemplary damages may be awarded only if the claimant proves by clear and convincing evidence that the harm with respect to which the claimant seeks recovery of exemplary damages results from . . . fraud . . . malice . . . or . . . gross negligence.'" *Mandel v. Thrasher (In re Mandel)*, 578 F. App'x 376, 391 (5th Cir. 2014) (quoting TEX. CIV. PRAC. & REM. CODE § 41.003); *accord Century Sur. Co. v. Seidel*, 893 F.3d 328, 337 (5th Cir. 2018), *cert. denied*, 139 S. Ct. 1326 (2019); *Edelman v. Drexel Highlander Ltd. P'ship, DGP, LLC*, No. 3:14-CV-4109-P, 2015 WL 5714728, at *7 (N.D. Tex. Sept. 28, 2015). "'Clear and convincing' means the measure or degree of proof that will produce in the mind of the trier of fact a firm belief or conviction as to the truth of the allegations sought to be established." TEX. CIV. PRAC. & REM. CODE § 41.001(2). Exemplary damages are inherently discretionary; therefore, "[t]he determination of whether to award exemplary damages and the amount of exemplary damages to be awarded is within the discretion of the trier of fact." *In re Mandel*, 578 F. App'x at 392 (quoting TEX. CIV. PRAC. & REM. CODE § 41.010); *Morris v. Aircon Corp.*, No. 9:16-CV-35, 2017 WL 3671173, at *10 (E.D. Tex. July 28, 2017), *adopted by*, No. 9:16-CV-35, 2017 WL 4410447 (E.D. Tex. Sept. 25, 2017).

The Weston Parties reference numerous factual findings by the bankruptcy court supporting its conclusion that Rose committed fraud. Importantly, however, the bankruptcy court was

required to find only that the Weston Parties established their fraud claims by a preponderance of the evidence.  *See Bombardier Aero. Corp.*, 572 S.W.3d at 221.  While the factual findings the Weston Parties highlight support the bankruptcy court's conclusion that Rose committed fraud under the preponderance of the evidence standard, they do not mandate that the bankruptcy court conclude that the same is true under the clear and convincing evidence standard required for an award of exemplary damages.  Indeed, Brandly, whom the bankruptcy court found to be credible, testified that he was "not positive [the Rose Parties] reached the level of fraud.  Misrepresentation, no question; unethical practice, in my mind, . . . no question at all."  Thus, it was reasonable for the bankruptcy court to conclude by a preponderance of the evidence that Rose committed fraud, but to reach a different conclusion under the clear and convincing evidence standard.  Moreover, the Weston Parties have not directed the court to a single appellate decision within the Fifth Circuit holding that exemplary damage were required in any situation.  Accordingly, the bankruptcy court did not abuse its discretion in declining to award Weston exemplary damages.

VI.    Conclusion

Consistent with the foregoing analysis, the bankruptcy court's judgment with respect to the Aaron Parties' damages award for breach of contract, Rose's violation of the TTLA arising from an improper stableman's lien, and McLaughlin's damages award is REVERSED.  The bankruptcy court's judgment, in all other respects, is AFFIRMED.  The case is REMANDED to the bankruptcy court for further consideration consistent with this opinion.

SIGNED at Beaumont, Texas, this 25th day of August, 2021.


_____
MARCIA A. CRONE
UNITED STATES DISTRICT JUDGE